**FOXGLENN INVESTORS LIMITED PARTNERSHIP, Plaintiff–Appellee,**

v.

**Henry G. CISNEROS, Secretary of Housing and Urban Development, Defendant–Appellant,**

and

**Jack Kemp, Secretary of Housing and Urban Development; Prince George's County, Department of Housing and Urban Development; Housing Authority of Prince George's County, Defendants.**

No. 94–1276.

United States Court of Appeals, Fourth Circuit.

Argued July 21, 1994.

Decided Sept. 19, 1994.

created a *de facto* agency for jurisdictional purposes.

948

**ARGUED:** Deborah Ruth Kant, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellant. David M. Sheehan, Kollman & Sheehan, P.A., Baltimore, MD, for appellee. **ON BRIEF:** Stuart E. Shiffer, Acting Asst. Atty. Gen., Lynne Ann Battaglia, U.S. Atty., Michael Jay Singer, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellant. Charles J. Morton, Jr., Kollman & Sheehan, P.A., Baltimore, MD, for appellee.

Before WILKINSON and LUTTIG, Circuit Judges, and ANDERSON, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINSON and Judge ANDERSON joined.

## OPINION

LUTTIG, Circuit Judge:

Appellee, Foxglenn Investors Limited Partnership (FGI), brought this suit to prevent appellant, the Department of Housing and Urban Development (HUD), from reducing contract rents paid to FGI under the Moderate Rehabilitation Program of the Housing Act of 1937. FGI argues that HUD is barred by 42 U.S.C. § 1437f(c)(2)(C) from ordering the rent rollback. The district court agreed with FGI and granted summary judgment. We affirm.

### I.

Congress enacted the Moderate Rehabilitation Program to encourage private owners of low-cost housing units to refurbish and rent the units to low-income individuals and families. Under the program, HUD provides funding to local public housing authorities (PHAs). The PHAs use this funding to provide financing for owners of housing units who choose to rehabilitate their existing units for low-income rental under the program. In exchange for participating in the program, the owners receive subsidies from the PHA in the form of "housing assistance payments."

Prior to renovation, the PHA and the owner enter into an Agreement to Enter into Housing Assistance Payments Contract (AHAP). The AHAP contains details about the proposed rehabilitation and specifies the initial "contract rent," which is the sum of the PHA subsidy and the rent required of the tenant. Once the rehabilitation is completed, the owner and the PHA enter into a Housing Assistance Payment (HAP) contract, which incorporates the terms of the AHAP and finalizes the contract rent. The contract rent is set at a level that both compensates an owner for rehabilitation costs and corresponds to the prevailing rental rates in a given market.

FGI participated in the Moderate Rehabilitation Program in 1986, entering into an AHAP and HAP with the Housing Authority of Prince George (HAPG) to renovate the Foxglenn Apartment Complex. Benton Mortgage Company, a HUD-approved private lender, calculated the contract rents, HAPG agreed to the rents in writing, and HUD approved the rents before the HAP contract was signed. These rents remained in effect until 1992, at which point HUD conducted an audit of FGI's HAP contract and concluded that the initial contract rents had been set too high and should therefore be reduced.

HUD attributed the purportedly excessive contract rents in part to "excessive charges for rehabilitation costs." Appellant's Br. at 7. HUD claimed that "[t]he bulk of the errors stemmed from ineligible change orders, whereby developers increased rehabilitation costs for changes occurring during construction which should have been foreseen." Id. HUD also claimed that FGI improperly included in its cost figure "ineligible costs (e.g. consultant fees) or inflated costs (e.g. bond fees)." Id. Neither HUD, HAPG, nor Benton objected to any of these charges at the time the initial contract rents were set in 1986.

Following the 1992 audit, HUD directed HAPG to implement rent rollbacks. HUD contended that FGI had received an overpayment of $270,228 between 1987 and 1992, and it ordered HAPG to recover this sum by reducing rent payments to FGI by $54,046 a year for the next five years. HUD also directed HAPG to reduce future rent payments to FGI by rolling back rents prospectively by $30,444 per year for the remainder of the HAP contract. HAPG protested the HUD action through HUD administrative channels, but these challenges were all rejected. FGI thereafter brought suit in federal district court in Maryland in January 1993, and the rollbacks were put on hold by stipulation until the end of this litigation.

The district court ultimately granted summary judgment in favor of FGI, holding that the language of 42 U.S.C. § 1437f(c)(2)(C) unambiguously bars HUD from reducing contract rents unless refinancing reduces the owner's periodic payments. The district court also held that neither HUD regulations nor the HAP contract authorizes the contemplated rent reductions. 844 F.Supp. 1078. This appeal followed.

## II.

Section 142(d) of the Housing and Community Development Act of 1987, which amended the Housing Act of 1937, is at the center of the dispute. Codified at 42 U.S.C. § 1437f(c)(2)(C), this provision reads in relevant part that,

> [t]he Secretary [of HUD] may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section ... unless the project has been refinanced in a manner that reduces the periodic payments of the owner.

This language was added to section 1437f(c) in response to arbitrary and ad hoc rent reductions instituted against owners participating in the Moderate Rehabilitation Program in the 1980s.* By its plain language, the rent-reduction bar in section 1437f(c)(2)(C) prohibits HUD from unilaterally reducing contract rents, except when a project refinancing reduces the owner's periodic payments. Given that FGI has not refinanced the Foxglenn Apartments complex, section 1437f(c)(2)(C), if applicable, plainly bars HUD from ordering the rent rollbacks at issue in this case.

---

* Indeed, when HUD continued to reduce contract rents even after this amendment was passed, Congress, frustrated by HUD's intransigence, amended the statute again only nine months later to ensure that any owners whose rents had been reduced in violation of section 1437f(c)(2)(C) would have their initial rents reinstated and their shortfalls under the reduction reimbursed. See 42 U.S.C. § 1437f(c)(2)(C) ("Any maximum monthly rent that has been reduced by the Secretary after April 14, 1987, and prior to [the enactment of this sentence] shall be restored to the maximum monthly rent in effect on April 15, 1987 ...."); see also H.R.Rep. No. 100–718(I), 100th Cong., 2d Sess. at 43 (1988), reprinted in 1988 U.S.C.C.A.N. 4395, 4426 ("It is the intent of Congress to take away HUD's right to make rent reductions absent a refinancing, regardless of whether or not there was a negative factor.").

Recognizing that application of section 1437f(c)(2)(C) would bar the contemplated rollback, HUD argues that this provision only prevents HUD from reducing rents when making annual adjustments for inflation and expenses pursuant to section 1437f(c)(2), and that it has no application where the agency seeks to reduce rents merely to "correct errors" in the initial contract rent, as HUD maintains it is doing in this case. Concomitantly, HUD contends that the proposed reductions are authorized by section 1437f(c)(1). This section, HUD says, expressly confers on the Secretary the power "to establish contract rents," and this power in turn carries with it the incidental power "to correct improperly set contract rents." *See* Appellant's Br. at 10 ("[T]he Secretary's authority to correct improperly set contract rents is part and parcel of his power to establish the contract rent."). In sum, according to HUD, section 1437f(c)(2)(C) only bars the agency from reducing rents when it exercises the "annual adjustment" power in section (c)(2), and therefore erects no bar to rent reduction where the agency concludes that rents were initially set improperly.

We reject HUD's analysis of section 1437f(c). Although HUD's attempt to limit application of the rent-reduction bar only to those adjustments enumerated in section 1437f(c)(2) is not entirely implausible, ultimately the construction of the statute on which it depends cannot be squared with the language of section 1437f(c)(2)(C).

The language of the rent-reduction bar itself confirms that Congress intended to prohibit HUD from reducing rents under circumstances beyond those identified in section 1437f(c)(2). The rent-reduction bar expressly allows HUD to reduce rents when "the project has been refinanced in a manner that reduces the periodic payments of the owner." 42 U.S.C. § 1437f(c)(2)(C). If, as HUD contends, section 1437f(c)(2)(C) only prohibits HUD from reducing rents when making the adjustments specified in section 1437f(c)(2), Congress would have had no need to reserve to HUD the power to reduce rent in the particular circumstance of a refinancing, because a reduction due to refinancing is

not an annual adjustment of the kind addressed in section 1437f(c)(2). Accordingly, a refinancing adjustment would not have been barred by the terms of section 1437f(c)(2)(C). In short, were we to accept HUD's interpretation of section 1437f(c)(2)(C), we would have to accept as well that the single express exception to the flat ban on rent reductions is surplusage. We simply do not believe this to be the case.

That the rent-reduction bar applies beyond the "annual adjustments" under section 1437f(c)(2) is reinforced by our belief that had Congress intended the construction advanced by HUD, it would have phrased the provision more narrowly so as to ensure that the bar on reductions would apply exclusively to the adjustment authority specified in subparts (c)(2)(A) and (c)(2)(B). Congress incorporated precisely such a limitation in a different provision within the very same section. *See* 42 U.S.C. § 1437f(c)(2)(C) ("Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and unassisted units. . . ."). In fact, HUD attempts to use this limiting language in support of its argument that the rent-reduction bar is applicable only to annual adjustments. The significance of this language, however, is not that it proves that section (c)(2)(C) is limited as HUD suggests, but rather that Congress knew well how to limit the rent-reduction bar to annual adjustments had it wished to do so.

Finally, we believe that HUD's asserted distinction between an "adjustment" and a "correction" of the contract rent, a distinction central to HUD's statutory argument, is a false distinction. In a correction, no less than in an adjustment, there can occur a reduction in rent. And it is reductions in rent that are expressly proscribed by section (c)(2)(C).

In sum, the language of the rent-reduction bar is most naturally read as a blanket prohibition, and we are unprepared to say that such expansive language is attributable to congressional imprecision. We believe it far more likely that this language was chosen to effectuate what appears to have been the congressional purpose in enacting the bar,

namely, to prevent HUD from mandating post-agreement rent-reductions on an *ad hoc* basis, thereby unsettling settled investment expectations.

 Our conclusion that the rent-reduction bar in section 1437f(c)(2)(C) is not confined to the annual adjustments particularized in section 1437f(c)(2) is buttressed by the flaws in HUD's companion argument, which is essential to the agency's contention that section 1437f(c) as a whole supports its construction of section 1437f(c)(2)(C). As noted, HUD argues that section 1437f(c)(1) confers on the Secretary the power to set contract rents, a power that includes a power to correct subsequently discovered errors in the agreed-upon rent. We do not believe that section 1437f(c)(1) can be read to confer on the Secretary the unilateral power to set contract rents. Nor, even conceding that the Secretary is so empowered, do we accept that he possesses the far-reaching implied power to correct errors.

 Section 1437f(c)(1) does not, contrary to HUD's assertion, authorize HUD to set the initial contract rents. Rather, that section provides that the "assistance contract ... shall establish the maximum monthly rent ... which the owner is entitled to receive." 42 U.S.C. § 1437f(c)(1). Thus, under this provision, it is the contracting parties, *i.e.,* the local public housing authority and the private owner of housing units, who establish the contract rents. To be sure, HUD plays an important role in determining the rent through its power to establish the "fair market rental" in a geographical area. *See* 42 U.S.C. § 1437f(c)(1). However, this is not tantamount to a unilateral authority to set contract rents. Indeed, although HUD persists in its argument that it has the power to set contract rents, its own statements refute that argument. *See* Appellant's Br. at 20 (noting that owners and PHA's are primarily responsible for setting the initial contract rent); Appellant's Reply Br. at 5 ("It bears emphasizing that Congress set up the program so that HUD is not a party to the HAP contract...."). HUD's contention that it possesses the power to correct errors as an incident of its power to set contract rents, therefore, is tenuous at best.

Even were we to accept that section 1437f(c)(1) authorizes HUD to set the initial contract rents, we would be hesitant to agree in the absence of express statutory language or other authority that the power to set rents necessarily includes the extraordinary power to alter unilaterally the contractual obligations of third parties. We would be especially reluctant to agree that Congress implicitly conferred such power where, as here, HUD is attempting to reduce rents for reasons analogous to those underlying the unilateral, arbitrary rent reductions that prompted Congress to add the rent-reduction bar in the first place. Just as HUD in the 1980s attempted to invoke its annual adjustment authority to reduce rents *ad hoc* based upon its comparability studies, *see* H.R.Rep. No. 100–122(I), 100th Cong., 1st Sess. at 32 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3348 ("HUD field offices have been making capricious and individualized rent reductions ... on an ad hoc and arbitrary basis."), so also here it attempts to use its section (c)(1) authority to reduce rents for alleged "errors" that are attributable in large part, if not wholly, to unpredictability in the market and inevitable market fluctuations, *see* Appellant's Br. at 7 (basing rent reductions on "ineligible change orders, whereby developers increased rehabilitation costs for changes ... which should have been foreseen"). A party to a HAP contract could never rely on the contract rents as fixed, as Congress intended, were the contract subject to change because of a factor so mutable as the perceived "foreseeability" of change orders.

It follows of course from our holding that section 1437f(c)(2)(C) bars the rent reductions proposed by HUD and from our rejection of HUD's claim that section (c)(1) confers on HUD the power to correct rents, that we reject HUD's collateral arguments in support of its contrary interpretation of these sections. Given our rejection of HUD's initial premise that section (c)(1) confers on the Secretary a power to correct errors, HUD's suggestion that our interpretation of the rent-reduction bar in section (c)(2) will import an unintended limitation on HUD's power to correct errors under section (c)(1) is simply inapposite. HUD's claim that any

limitation on HUD's power to correct errors should appear in section (c)(1) rather than in section (c)(2) is similarly unpersuasive. As we have held, section (c)(1) addresses only the establishment, not the correction, of contract rents. There consequently would be no reason to include in that section a limitation on the correction of errors. The limitation on rent reductions appears exactly where logically one would expect it to appear—in section 1437f(c)(2), the only section that addresses the agency's power to adjust contract rents.

In the end, while we agree that Congress could have positioned section 1437f(c)(2)(C) better, so as to leave even less doubt that it intended to prohibit all rent reductions except in the case of refinancing, we believe that the provision's language provides dispositive evidence of Congress' intention to sweep broadly with its bar to rent reductions. Because of the clarity of this language, HUD is left with little more than a strained structural argument and the bald assertion of an implied power to alter the contractual obligations of third parties, which would be subject to few, if any, limits. We find neither argument persuasive against the unambiguous language of section 1437f(c)(2)(C). *Accord Terrace Hous. Assocs., Ltd. v. Cisneros*, 32 F.3d 461, 463 (10th Cir.1994) ("We find that the 1987 amendment explicitly prohibits all reductions of contract rents."), *aff'g Terrace Hous. Assocs., Ltd. v. Kemp*, No. CIV 92–786–T, 1993 WL 643371 (W.D.Okla. May 11, 1993) *and Rolling Green Hous. Assocs., Ltd. v. Kemp*, No. CIV–92–1372–T, 1993 WL 643224 (W.D.Okla. May 11, 1993) *and Windsong Hous. Assocs., Ltd. v. Cisneros*, No. 92–C–647–E, 1993 WL 625518 (N.D.Okla. Nov. 26, 1993); *Atlantic Terrace Ltd. Partnership v. Cisneros*, No. Civ. 94–0051, 1994 WL 248239 (D.D.C. May 23, 1994); *Linden Hous. Assoc., Ltd. v. Cisneros*, No. CV–N–92–358–HDM (D.Nev. Feb. 23, 1993).

HUD's overarching concern with our interpretation of section 1437f(c)(2)(C) seems to be that a *"per se"* bar on any and all types of rent reductions would prevent the Secretary from correcting errors due to fraud, basic arithmetic, clerical mistakes, and any other kind of serious error stemming from noncom-

pliance with HUD's standards." Appellant's Br. at 10; *see also* Appellant's Reply Br. at 5 ("The statute simply does not mean that the government cannot correct, for instance, a misplaced decimal point that results in millions of dollars of excess subsidies."). This concern, however, is not implicated on the facts before us. HUD does not contend that FGI committed fraud in any aspect of its dealings with the agency, nor, insofar as we have been made aware, does the contract between FGI and HAPG contain a clerical error. Rather, HUD is attempting in this case to reduce rent payments primarily on the ground that it has decided that the payments to which it earlier assented exceed those that FGI should reasonably expect to receive. Reduction of rents for such reasons is precisely what Congress proscribed in section 1437f(c)(2)(C). Whether or not HUD could correct rents for arithmetic or clerical errors under section 1437f(c) or a residual authority of the sovereign is a question that we need not, and do not, address herein.

### III.

■ Our interpretation of section 1437f(c)(2)(C) perforce renders unavailing HUD's alternative reliance upon its own regulations and the HAP contract for its authority to order the rent rollbacks against FGI. To the extent that the regulations can be interpreted to authorize rollbacks prohibited by section 1437f(c)(2)(C), they are of course invalid. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). It appears in any event that neither the regulations nor the contract between FGI and HAPG has any real bearing on this case. HUD finds support for its position in two regulations, 24 C.F.R. § 882.408(d)(1)(v) and 24 C.F.R. § 882.507(c). The first of these, 24 C.F.R. § 882.408(d)(1)(v), provides as follows:

(d) *Changes in Initial Contract Rents during rehabilitation.* (1) The initial Contract Rents ... will be the Contract Rents on the effective date of the Contract except under the following circumstances: ... (v) When necessary to correct errors in com-

putation of the base and Contract Rents to comply with the HUD requirements.

This regulation clearly addresses HUD's authority to change contract rents *during* rehabilitation. Since the reductions in this case occurred well after rehabilitation, this regulation would appear to be inapplicable.

 The second regulation, 24 C.F.R. § 882.507(c), states:

(c) *Actual cost and rehabilitation loan certifications.* The Owner must provide the PHA with a certification of the costs incurred for the rehabilitation and any temporary relocation as well as the interest rate and term of any rehabilitation loan. The Owner must certify that these are the actual costs, interest rate, and term.

The PHA must review for completeness and accuracy and accept these certifications subject to the right of post audit. The PHA must then establish the Contract Rents as provided in § 882.408 which will be subject to reduction based on a post audit.

HUD argues that this provision authorizes it to conduct "post-audits" to verify the correctness of contract rents. As the district court concluded, this provision does not grant HUD plenary power to conduct audits and correct errors. HUD's post-audit authority is limited to verifying the owner's cost and rehabilitation loan certifications, and corrections may be made only if those certifications have errors. This regulation is inapplicable because the audits conducted by HUD were conducted for reasons other than those authorized by the regulation.

HUD's reliance upon the HAP contract between FGI and HAPG for authority to reduce the initial contract rents likewise is misplaced. Section 1.5 of the contract reads as follows:

A. Amount of Contract Rent.... These rents are subject to post-audit and change in accordance with HUD requirements, including the correction of errors in computation.

This provision appears to do nothing more than allow HUD to conduct audits and implement rent changes in the narrow areas authorized by the applicable statute and regulations. Such a power can be of no benefit to HUD here, in light of our interpretation of section 1437f(c)(2)(C).

## IV.

For the reasons stated, the judgment of the district court is affirmed.

*AFFIRMED.*