In re CARRINGTON GARDENS ASSOCIATES, Debtor.

Carrington Gardens Associates, Plaintiff,

v.

United States of America, Defendant.

**Bankruptcy No. 97–28939S.**
**Adversary No. 98–2071–S.**

United States Bankruptcy Court, E.D. Virginia, Norfolk Division.

May 5, 2000.

Gregory Stefan, Assistant United States Attorney, Norfolk, VA.

Gregory L. Sandler, Epstein & Sandler, P.C., Norfolk, VA, for Carrington Gardens Associates.

## Memorandum Opinion and Order

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter comes upon the Motion for Summary Judgment filed by the United States of America (the "United States"). The United States files this motion pursuant to Federal Rule of Bankruptcy Procedure 7056, incorporating Federal Rule of Civil Procedure 56 and asks this Court to grant summary judgment on the Complaint filed by Carrington Gardens Associates ("Carrington"), which commenced the present adversary proceeding. Pursuant to the federal rules, the Court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

In determining whether a genuine issue of material fact exists in this adversary proceeding, the Court has examined the pleadings, the exhibits, and the affidavits the parties have filed in conjunction with the United States' Statement of Administrative Record and Statement of Material Facts in Support of Motion for Summary Judgment ("United States' Statement of Facts") and the pleading filed by Carrington styled as Carrington Garden's Additions to Administrative Record and Statement of Facts in Opposition to Motion for Summary Judgment ("Carrington's Statement of Facts").[1] Having considered the above documents, the parties' briefs, and after hearing the parties at oral argument, the Court makes the following findings as to material facts and resulting conclusions of law.

## Findings of Material Fact

The Plaintiff is a Virginia limited partnership with its principal office located in Virginia Beach. Mr. Herbert J. Zuckerman ("Zuckerman") is the Debtor's designated representative and is President of CGFA, Inc., the Debtor's general partner. Carrington's principal business activity was the ownership and operation of a multi-family apartment project located in

---

1. Carrington's Statement of Facts states that "[t]he Plaintiff adopts the Declaration of Herbert J. Zuckerman as the outline of Plaintiff's statement of facts, and to the extent that they differ from those alleged to be undisputed material facts alleged by the Defendant ... they are offered in opposition to the Motion for Summary Judgment." (Carrington's Statement of Facts at 2.) Based on this statement, the Court, in ascertaining whether a genuine issue of material fact exists, treats the facts derived from the United States' exhibits and outlined in the United States' Statement of Facts as undisputed to the extent that the outline of facts contained within the Declaration of Zuckerman does not differ with them.

Richmond, Virginia (the "Project").[2] The Project consists of a complex of 102 individual residential apartment units located on approximately 4.47 acres of land in Richmond. Plaintiff acquired the Project, then known as Monticello Manor, on May 15, 1985 and, upon acquisition, renamed the project Carrington Gardens.

### The 236 Loan

As part of the Project's acquisition, Carrington assumed a First Deed of Trust on the property. The Federal National Mortgage Association ("Fannie Mae") held a Note which the First Deed of Trust secured with an original principal balance of $1,212,300.00. The United States Department of Housing and Urban Development ("HUD") insured payment to the mortgagee pursuant to Section 236 of the National Housing Act (the loan made by Fannie Mae and insured by HUD is hereinafter referred to as the "236 Loan"). *See* 12 U.S.C.A. § 1715z–1 (West 2000). In exchange for the United States' commitment to insure the 236 Loan, the Plaintiff executed a regulatory agreement with HUD dated May 16, 1985 (the "236 Regulatory Agreement"). The 236 Regulatory Agreement is recorded in the land records and is incorporated by reference into the Deed of Trust. The 236 Regulatory Agreement imposes several duties on Carrington and governs the manner in which Carrington must operate the Project. The agreement also regulates the rents Carrington may charge to renters.[3]

The 236 Loan Note contains an interest rate subsidy that reduces the effective interest rate the Owner must pay on the mortgage from the Note rate of seven percent to one percent. The United States' agreement to pay the interest subsidy on the loan is contained within the Commitment for Insurance of Advances dated March 2, 1971, which the Debtor assumed when it assumed the deed to the Project. That document states:

The Commissioner agrees to make annual interest reduction payments not to exceed the sum of $49,696.00. Such payments will be paid on a monthly basis in accordance with the FHA regulations applicable to the program.

(United States' Exhibit # 102.) Pursuant to statute, interest subsidy payments may be made as long as HUD insures or holds the mortgage. *See* 12 U.S.C.A. § 1715z–1(B). By its own regulations, HUD may

---

**2.** As of the time of this adversary proceeding's filing, Carrington was still in control of the Project's operations. The United States filed a Motion for Relief from the Automatic Stay, dated September 11, 1998, seeking the Court's permission to allow the United States Department of Housing and Urban Development ("HUD") to foreclose on, take possession of and operate the Project. In a consent order entered on November 6, 1998 resolving the motion, HUD was granted relief from the automatic stay and was permitted to take over the Project's assets as mortgagee-in-possession. Carrington consented to HUD taking possession on the condition that, within thirty days after entry of a final order in the present adversary proceeding, Carrington may regain possession of the property upon payment of its full indebtedness under the notes that HUD currently holds, including interest, charges, fees, and costs, less any credit to which the Court determines Carrington is entitled. Carrington would also have to pay for any repairs and improvements HUD makes while it is in possession of the Project.

**3.** Paragraph four of the 236 Regulatory Agreement provides that the Owners agree that:

"(a) with the prior approval of the [Federal Housing] Commissioner, they will establish for each dwelling unit (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest under a mortgage bearing instrument at one percent and (2) a fair market rental charge determined on the basis of operating the project with payments of principal, interest and mortgage insurance premiums due under the insured mortgage on the project; (b) the rental charged for each unit, which will include all utilities except telephone, will be equal to 25% of the tenant's income or the basic rental, whichever is greater, but in no event shall the rental charged exceed the fair market rental;

(*l*) no change will be made in the basic rental or fair market rental unless approved by the Commissioner;"

(United States' Exhibit # 114)

terminate the interest reduction subsidy at its discretion, provided that the owner does not comply with the terms of a regulatory agreement into which the owner has entered with HUD. *See* 24 C.F.R. § 236.510(b)(3) (2000). HUD paid this interest subsidy directly to Carrington until the 236 Loan was assigned to HUD, as detailed *infra.*

In addition, as part of the 236 Regulatory Agreement, Carrington agreed to maintain a reserve fund to be used for the replacement of capital items ("Replacement Reserve Fund"). Pursuant to paragraph two of the agreement, Carrington was to deposit $416.00 per month into this fund, which was to be, at all times, under the control of the mortgagee. Carrington was permitted to make withdrawals from the Replacement Reserve Fund only upon HUD's express written consent. Under the terms of the agreement, in the event of Carrington's default, HUD was authorized to apply the balance of the Replacement Reserve Fund to the accelerated balance of the mortgage due. Beginning in October 28, 1992, HUD denied seven replacement reserve withdrawal requests by Carrington because of purported violations of the 236 Regulatory Agreement.

### The HAP Contract, Rent Increases, and Additional LMSA Unit Requests

Carrington and HUD entered into a Housing Assistance Payments (HAP) contract dated September 30, 1987. Pursuant to the contract, HUD agreed to subsidize the rent for fifty units contained within the Project, up to a total of $164,400 per year. These units are sometimes referred to as Loan–Management Set–Aside (LMSA) or Section 8 units. The HAP contract originally ran through September 30, 1992 and was subsequently renewed and its term extended to September 30, 1997. The HAP contract's terms required the Debtor to comply with applicable housing regulations and the 236 Regulatory Agreement.

The HAP contract also provided a mechanism for adjustments of rents in accordance with applicable regulations and administrative procedures on units which the HAP contract governed and also provided for the increase of the annual contract amount based upon HUD-approved rent increases. The amount of a rent increase was based upon Project expenses.

The HAP contract provided a mechanism by which Carrington could apply to HUD for rent increases by submitting an application. HUD would then evaluate the rental increase applications based on whether the owner was in compliance with its regulatory and contractual agreements and whether the increase was financially justified based on audited financial statements of the Project. After Carrington took over the Project, rents were increased on four separate occasions, from March 1986 to June 1994. Five rental increase requests, dated from June 29, 1992 to June 1997 were denied due to the Owner's purported violation of the 236 Regulatory Agreement.

In a letter dated February 11, 1993, Zuckerman wrote to Congressmen Owen Pickett regarding the current status of the Project as of that date. (United States' Exhibit # 503.) Carrington included as an attachment to that letter a Memorandum of Historical Events regarding the operation of the Project since Carrington had assumed it. In that memorandum, Carrington asserted that HUD had approved a $330 per month rental increase, but prevented HUD from implementing the increase in full.

In addition to requesting rental increases, owners of HUD-administered buildings may request that additional LMSA units be approved under a HAP contract. On three occasions from 1991 to 1993, Carrington applied for an increase in the number of LMSA units approved under the HAP contract from 50 to 75. HUD denied all three increases. The first application was denied for being untimely filed and the second two applications were denied on the basis that Carrington was purportedly in violation of the regulatory agreement.

*The 241 Loan and Construction Project*

On February 28, 1989, Carrington closed on a credit-line loan and executed a Second Deed of Trust Note secured by the Project. Carrington entered into this loan in order to finance capital improvements to the Project. The second Note was payable to Marble Mortgage Corporation in the amount of $307,200.00. HUD insured the credit-line loan, in this instance, pursuant to Section 241 of the National Housing Act (the "241 Loan"). *See* 12 U.S.C. § 1715z–6 (West 2000). The 241 Loan Note accrued interest at the rate of twelve percent per year and required monthly interest payments from March through October 1989 and monthly payments of both interest and principal through October 1, 2011.

Simultaneously with executing the Second Deed of Trust Note, the Plaintiff executed a second regulatory agreement with HUD dated February 28, 1989 (the "241 Regulatory Agreement"). The 241 Regulatory Agreement is similar in all material respects to the 236 Regulatory Agreement. (United States' Exhibit # 168.)

In January of 1989, Carrington entered into a Construction Contract with William A. Simkins Associates for the work to be performed on the Project that the 241 Loan financed. Mr. William Simkins ("Simkins") was both a principal of the general contractor and Carrington's general partner at the time. The construction contract provided that a work write-up was to be filed with HUD and that no changes to the work write-up or changes or additions to work actually performed could be made without prior written approval of Marble Mortgage and HUD. (United States' Exhibit # 155.) Both HUD and Marble Mortgage accepted the original work write-up.

The United States asserts that the work write-up contained specific numbers of furnaces, air conditioners, stoves, water heaters, refrigerators, kitchen fans, and smoke detectors that were to be added or replaced, that all flat roofs were to be repaired and that the amount payable under the contract would not, in any event, exceed $302,351.00.

Carrington and Marble Mortgage also executed a Building Loan Agreement with the Debtor in connection with the 241 Loan. (United States' Exhibit # 156.) The Building Loan Agreement provided that the Debtor would complete construction in accordance with the work write-up by October 1, 1989 and that all changes in the work write-up were required to have the prior written approval of the architect, Marble Mortgage, and HUD. Carrington further agreed that the undistributed proceeds on the 241 Loan would always equal or exceed the cost of completing construction in accordance with the work write-up. The Building Loan Agreement contained provisions which provided that the Debtor would be in default of the Building Loan Agreement if it abandoned the project, ceased work, failed to complete construction strictly in accordance with the drawings and specifications, or made changes to the work write-up without the prior written approval of the architect, Marble Mortgage, and HUD.

In addition to the Building Loan Agreement and 241 Regulatory Agreement, Carrington, Marble Mortgage, and HUD also executed an additional Agreement and Certification relating to HUD's insurance of the mortgage. (United States' Exhibit # 163.) In that agreement, Carrington agreed to provide HUD with a fully completed and executed Mortgagor's Certificate of Actual Cost and Contractor's Certificate of Actual Cost, both supported by a certified public accountant's certificate.

In April of 1990, HUD decided that it would no longer insure the 241 Loan, after which, Marble Mortgage declined to issue further advances. HUD used the findings of several inspectors as its basis for denying its continued insurance of the 241 Loan, and the capital improvements that the 241 Loan was supposed to fund pursuant to the initial work write-up were never completed to HUD's satisfaction. The

parties dispute, however, why the construction was not satisfactorily completed.

From May 12, 1989 to February 13, 1990. Mr. Van Bakergem[4] ("Van Bakergem") inspected the project. The United States maintains that, during the period of Van Bakergem's inspections, the job was seriously behind schedule, was disorganized, had inadequate planning, supervision and control, and did not have sufficient records. Further, during this period, the United States claims that there was no architect log at the site and the architect provided little, if any, supervision. In addition, the United States maintains that Carrington had not replaced all furnaces as required and that the project was financially unstable. On February 2, 1990, Van Bakergem inspected the construction job and determined that the actual percentage of job completion was only 87%; however, shortly after making that determination Van Bakergem died and was replaced by Robert S. Lewis ("Lewis").

On March 2, 1990, Lewis conducted a site visit, met with Simkins and found several problems. The United States contends that Lewis determined that construction was behind schedule and, among other deficiencies, that the construction deviated from the construction contract and work write-up. Lewis subsequently resigned from the project, on the basis of personal safety concerns the United States contends, and Anthony Batchelor ("Batchelor") replaced him.

In a letter dated March 19, 1990, Simkins advised HUD that the debtor had significantly expanded the scope of work well beyond the initial work write-up to a point "well beyond economic feasibility." (United States' Exhibit # 234.) On March 22, 1990, Batchelor noted that "it appears as though work was billed and paid for, but is not part of the contract." (United States' Exhibit # 239.) On March 29, 1990, Batchelor inspected the construction progress and determined that construction was only 36% complete, though the con-

tractor had received draws based upon 87% completion. Batchelor also noted that the contractor failed to perform necessary work called for in the initial work write-up. The construction site was additionally inspected on April 6, 1990, and the United States maintains that inspection showed that released funds had been used to pay for work not required in the construction contract. After that inspection, HUD decided it would no longer insure the 241 Loan until actual percentage of completion equaled the percentage drawn on the loan. On that basis, Marble Mortgage declined to issue further advances.

On June 18, 1990, HUD advised Marble Mortgage that the agency had met with the contractor and determined that a change order was essential to enable HUD to determine the actual percentage completion of the job. A change order was provided to HUD in November of 1990 and was submitted to change the contract to conform with the actual work that Carrington and the contractor said was done. After an initial denial, the change order was eventually approved and HUD inspected the construction site on January 30 and 31, 1991 and April 15, 1991. In those inspections, HUD found that gas lines were not properly installed, that defective roofing conditions were present, that a natural gas conversion was not completed and that required appliances were not installed. On May 9, 1991, HUD estimated that between $88,144.00 and $134,-365.00 was necessary in order to complete construction as specified on the change order. As a result, HUD refused to insure the release of additional funds under the 241 Loan. The construction was never completed in accordance with the amended construction contract.

Carrington does not dispute that it entered into a construction agreement with William A. Simkins & Associates, or that it entered into a Building Loan Agreement and separate regulatory agreements in

---

4. It is unclear from the record precisely what is Mr. Van Bakergem's first name.

conjunction with the credit-line deed of trust. Neither does Carrington dispute that the provisions of the Building Loan Agreement, the regulatory agreements, or any other associated agreements are what the United States maintains. Carrington concurs that it presented a superficial work scope write-up to HUD and Marble, which they both accepted, but asserts that the write-up did not quantify such items as the number of appliances to be replaced or the actual work to be performed on a per unit basis.

Carrington also asserts that the various inspectors that HUD employed approved of various changes to the scope of the improvements and that Carrington obtained various approvals. Carrington does not dispute that these changes were not documented in writing, but asserts that Van Bakergem died before he could document the changes. Carrington further does not dispute that Van Bakergem only certified that the job was 87% complete, but maintains that that figure was based on the undocumented modifications and on work actually performed. Carrington further does not dispute Batchelor's findings in his inspection report, but claims that those findings were based upon Batchelor's comparing the actual work performed to the generic work schedules that had been subject to undocumented modifications and that Batchelor did not consider whether additional work actually had been performed.

Carrington does not dispute that the change order reconciling the work actually performed with the written construction documents was approved in November of 1990. Carrington does assert that, because funds were frozen between April and November of 1990, the freeze caused unpaid contractors to initiate mechanics liens, that the Partnership operating the Project was forced to expend project funds for legal fees in defense of those claims, and that the freezing of funds caused the Debtor to miss the April 1990 payment of its 236 Loan.

Carrington further does not dispute that, after the change order was approved, subsequent inspections on January 30 and 31 of 1991 revealed that some gas lines had not been properly installed and that some appliances remained uninstalled. Carrington does assert that Batchelor did not contact the City of Richmond to see if the city ever approved of, or would be willing to accept the improperly installed gas lines noted on the January 31, 1991 inspection report. Carrington concurs that HUD communicated to the Debtor that HUD issued an estimate that between $83,000 and $134,000 was needed to complete the work and that, on that basis, HUD refused to release additional funds; however, Carrington maintains that that estimate was erroneous because it assumed that replacement of the gas pipes was necessary, though HUD had made no inquiry to the City on that matter. Carrington further claims that, even though the estimate included replacing forty-one appliances, the inspector had only found that six appliances were actually in need of replacement. Carrington therefore attributes its failure to complete the construction contract as amended to the "clearly erroneous cost estimates associated with the completion of the job." Carrington does not contest that the work as specified in the contract with the approved change order was never completed. Carrington also admits that, from April 26, 1991 on, the 241 Loan remained in default and no payments were made until after the Debtor filed for relief under the Bankruptcy Code in December of 1997.

### Default on the 236 Loan and Assignment of the Notes

Besides failing to make payments on the 241 Loan, Carrington missed several payments on the 236 Loan as well. On March 29, 1990, Carrington failed to pay the April 1990 mortgage payment. On May 4, 1990, HUD notified the Debtor's general partner that the 236 Loan was in default and that, unless the Debtor entered into a reinstatement plan acceptable to HUD within 30

days, HUD would withhold $6,191.85 of the Debtor's monthly payments under the HAP contract and apply the withheld amount against the delinquency of the 236 Loan. The Debtor was advised that it was still obligated to make the regular monthly payment of the 236 Loan, and monthly disbursements under the HAP contract were withheld until October 1991.

On April 10, 1991, Fannie Mae assigned the Deed of Trust Note securing the Section 236 Loan to HUD. Zuckerman, in the capacity of the president of the corporation that had succeeded Simkins as general partner of Carrington, was advised of the assignment in a letter dated June 28, 1991. On November 11, 1991, Marble Mortgage assigned to HUD the Second Deed of Trust Note securing the 241 Loan. Zuckerman was advised of this assignment in a letter dated November 12, 1991. In a letter dated April 8, 1992, HUD advised the Debtor that "Since the ownership allowed the [Section 241] loan to go into default and it has been assigned to HUD, there are no additional mortgage funds available." (United States' Exhibit # 410.)

### The June 22, 1992 and October 26, 1995 Audit Report

On June 22, 1992, HUD issued an audit report on the Carrington Gardens Project in order to determine whether the Debtor was operating the Project in accordance with the regulatory agreements and HUD directives. The audit report listed several deficiencies with the project and, from approximately July 15, 1992 through October of 1995, HUD sought information from the Debtor to clear or correct the findings. On October 26, 1995, HUD issued a supplemental report noting that all but four of HUD's audit findings had been cleared. The audit findings that remained uncleared were: 1) that $12,740 in payroll costs were improperly allocated between Carrington and another entity that had owners in common with the Debtor; 2) that HUD could not verify that $14,960 allocated for Project capital improvements had been used for the improvements speci-

fied; 3) that Carrington did not provide sufficient documentation to support $127,972 in costs paid from Project funds; and 4) that the Project owners allegedly improperly withdrew $17,175 from the tenant security deposit trust account to fund operating deficits. In all instances, HUD maintained that the uncleared audit findings allegedly constituted violations of the 236 Regulatory Agreement.

Carrington disputes that it was in violation of the first uncleared audit finding and maintains that it supplied sufficient documentation to HUD to clear that finding. (Decl. of Zuckerman ¶ 37.) Carrington asserts that HUD wrongfully refused to accept that documentation as acceptable evidence that Carrington was in compliance with the regulations. *Id.* Carrington does not dispute that it was in technical violation of the second uncleared audit finding, but attributes the violation to HUD erroneously preventing the disbursement of 241 Loan proceeds. (Decl. of Zuckerman ¶ 33.) Carrington maintains that it supplied documentation sufficient to clear uncleared audit finding three. (Decl. of Zuckerman ¶ 37.) In relation to the final uncleared audit finding, Carrington does not dispute that it had withdrawn the money (though Carrington claims that the amount was only $17,150), but maintains that HUD had knowledge of the withdrawals as far back as 1985, and that the security deposit matter was never an issue preventing HUD from granting rent increases, repair and replacement requests, or preventing renewal of the HAP contract. (Decl. of Zuckerman ¶ 34.) Furthermore, Carrington claims that, as of 1995, the Project fully restored the security deposit balance and that the security deposit trust account was fully funded. (Decl. of Zuckerman ¶ 35.)

### Procedural History

On September 26, 1995, HUD's Richmond Office recommended that the Secretary of HUD foreclose on the Project based upon the 241 Loan delinquency. On October 12, 1995, HUD advised Zucker-

man that the mortgage on Carrington Gardens was in default, that HUD had declared the entire unpaid balance due and payable, and that HUD would proceed with foreclosure. Zuckerman was given twenty-one days to respond to the letter and to arrange for a meeting so he could discuss with HUD why HUD should not proceed with the foreclosure. On February 5, 1996, HUD advised the Debtor's attorney that HUD was proceeding with foreclosure. On May 20, 1996, HUD rescinded its declaration of default and withdrew the foreclosure action after Carrington and the United States filed a voluntary stipulation of dismissal in a lawsuit which the Debtor filed to enjoin foreclosure.

On October 11, 1996, HUD's Richmond Office again recommended foreclosure based upon several grounds, including Carrington's failure to correct audit findings and on Carrington's continued violation of the regulatory agreements and HUD regulations. In an October 17, 1996 letter, HUD again advised Zuckerman that the entire unpaid balance of the loans was due and that HUD was proceeding with foreclosure. In another letter dated January 27, 1997, HUD advised Zuckerman that the Debtor was in violation of the regulatory agreement on additional grounds. On March 25, 1997, HUD advised Zuckerman that the entire balance of the 241 Loan was due and payable and that HUD was proceeding with foreclosure. On April 24, 1997, HUD served formal and final notice that the debtor was in contractual default of the regulatory agreement. On October, 1997, the Foreclosure Commissioner mailed a Notice of Default and Foreclosure Sale to the Debtor advising that a foreclosure sale was scheduled to be held on December 12, 1997 at 11:00 a.m.

On December 9, 1997, Carrington filed a petition for relief under Chapter 11 of the Bankruptcy Code. On May 6, 1998, Carrington filed a Complaint for Monetary Relief and Declaratory Relief against the United States in this Court, initiating the current adversary proceeding.

In its Complaint, Carrington alleges that it has incurred damages as a result of HUD's alleged breaches of the two regulatory agreements and the construction agreements associated with the 241 Loan construction ("construction agreements"). Specifically, the Plaintiff alleges:

12. That during the construction work on the subject project ... HUD wrongfully refused to make approved disbursements of the proceeds of the Marble Mortgage loan to satisfy the requirements of contractors, directly resulting in the inability of Plaintiff to have the work completed.

13. That the failure of HUD to approve these disbursements *constituted a breach of the 2nd* [241 Regulatory] *Agreement and the construction agreements* created in connection with this loan.

14. That as a direct result of HUD's breach of the construction agreement [sic] and 2nd Regulatory Agreement, the Plaintiff was prevented from completing the required repairs and capital improvements to the project.

15. That as a result of the Plaintiff's inability to complete the required repairs. HUD refused to grant the rental increases that had been anticipated ... to satisfy the payment obligations of the Second Deed of Trust Note, and as a result, the Plaintiff was unable to make any payments to the Second Deed of Trust Note Holder.

(Complaint ¶¶ 12–15) (emphasis added).

Additionally, Carrington alleges that HUD breached the 236 Regulatory Agreement by wrongfully declaring the Plaintiff in default of the regulatory agreement as a result of the findings of the October 26, 1995 Audit Report (the "Audit Report"), Specifically, the Plaintiff alleges:

18. That the Audit Report identified four disputed audit items, each of which HUD claims that the Partnership has failed to properly satisfy or address, thereby constituting breaches of the [236] Regulatory Agreement.

19. That, in fact, the Plaintiff was not in breach of any of the provisions of the Regulatory, Agreement, and produced information sufficient to satisfy the Audit Report items.

20. That as a direct result of the refusal of HUD to correct the record of the audit report, HUD declared the loan secured by the project to be in default as a result of alleged violations of the Regulatory Agreement.

21. That the Plaintiff maintains that the loan is not in default, that certain items of concern in the Audit Report have been fully satisfied, that HUD has failed to identify with specificity that would allow the Plaintiff to cure, [sic] several items of concern in the Audit Report, and that as a result, HUD has not correctly declared a default.

22. That *HUD's action in declaring a default is a breach of the Regulatory Agreement,* since default and acceleration of the underlying mortgage balance is not supported by a breach of the Agreement by the Plaintiff.

(Complaint ¶¶ 18–22) (emphasis added).

Carrington claims that, as a result of HUD having declared a default in the terms of the 236 Regulatory Agreement, HUD continued to refuse to permit the Plaintiff to obtain periodic rent increase in the rent charged to tenants, and refused to permit the Plaintiff to obtain payment from its repair and replacement reserve accounts. Carrington alleges that those additional refusals constituted additional breaches of the regulatory agreements. (Complaint ¶ 23.) Plaintiff also contends that, as a result of the inability to obtain current market rents, and the inability to receive replacement and repair reserve funds, it has been deprived of the funds needed to maintain the physical property to attract tenants. Carrington alleges it has suffered damages "as a direct and proximate result of the continuing breaches of the Regulatory Agreement and construction agreement" and requests monetary relief in the amount of $904,500.00. (Complaint ¶¶ 25–26.)

In addition to the request for monetary relief stemming from breaches of the regulatory and construction agreements, Plaintiff also requests declaratory relief. Carrington alleges that, under the 236 Regulatory Agreement and associated loan documents, the subsidy HUD granted Carrington on the interest payable on the 236 Loan should be credited against the interest rate established in the first Deed of Trust Note. The Plaintiff further alleges that it has repeatedly requested that HUD provide a payoff, applying the subsidy as a credit to the amount due, and that HUD has refused to provide such a payoff. On that basis, Carrington seeks a Declaratory Order that it may effect a payoff of the loan balance after receiving credit for the subsidy and making the payoff calculation.

HUD filed a proof of claim in this matter on June 8, 1998, subsequent to the filing of Carrington's Complaint. In its proof of claim, HUD asserted that the amount of its claim was $1,130,777.10, inclusive of interest or other charges, that the basis of the claim was a mortgage default and that the claim was secured by real estate with a value of $542,582. HUD moved for summary judgment on the Complaint in a motion dated November 30, 1998.

## Conclusions of Law

### I. Subject Matter Jurisdiction and Sovereign Immunity

Carrington contends that 28 U.S.C. § 1334(b), 28 U.S.C. § 157 and the Tucker Act, 28 U.S.C. § 1491, give this Court subject matter jurisdiction over the case.[5] Carrington also contends that the United States has waived sovereign immunity with

---

5. The Plaintiff alleges jurisdiction in its Complaint under 28 U.S.C. § 157 and, erroneously, 28 U.S.C. § 1224. In a supplemental pleading, the plaintiff clarifies that it alleges jurisdiction under 28 U.S.C. § 157, § 1334 and § 1491.

respect to its entire claim pursuant to 42 U.S.C. § 1404(a) and 11 U.S.C. § 106(c).

The United States asserts that Carrington's claims are barred, at least in part, under the doctrine of sovereign immunity. While it concurs with Carrington's contention that this Court has jurisdiction under 28 U.S.C. § 1334(b), the United States disagrees with Plaintiff that 42 U.S.C. § 1404(a) waives its immunity. The United States does concede, however, that it has waived sovereign immunity under the Tucker Act to the extent this is a breach of contract case. The United States additionally asserts that the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, read in conjunction with 28 U.S.C. § 1334(b), waives sovereign immunity to the extent that the claims are not time barred; however, the United States contends that because the APA applies, Carrington may not recover damages. Alternatively, the United States argues that several of Carrington's damage claims, especially the Plaintiff's claims stemming from failure to insure construction advances under the 241 Loan, are barred by the statute of limitations. The United States takes no position as to whether it has waived sovereign immunity pursuant to 11 U.S.C. § 106(c).

■ While the United States' concessions as to the Court's possessing subject matter jurisdiction, and particularly to its waiver of sovereign immunity, are instructive, the bankruptcy court is a federal court possessed with limited jurisdiction as to subject matter and the Court cannot obtain jurisdiction over a case by consent. *See Poplar Run Five Ltd. Partnership v. Virginia Elec. & Power Co. (In re Poplar Run)*, 192 B.R. 848, 854–55 (Bankr.E.D.Va. 1995); *see also Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 399 (4th Cir.1992); *McCorkle v. First Pa. Banking & Trust Co.*, 459 F.2d 243, 244 n. 1 (4th Cir.1972). Lack of subject matter jurisdiction over a case may be raised as a defense at any time during the proceedings. *See In re Poplar Run*, 192 B.R. at 855. Thus,

when the Court feels that it may be lacking subject matter jurisdiction over a case, it must raise the issue, sua sponte, and examine whether it has jurisdiction to hear the case. *See McCorkle*, 459 F.2d at 244 n. 1; *In re Poplar Run*, 192 B.R. at 855.

Issues of sovereign immunity and immunity waiver pertain to the Court's subject matter jurisdiction. The United States Supreme Court has stated that the terms of the United States' consent to be sued define a court's jurisdiction to entertain suit and, as such, the terms of consent are the finite parameters of a court's subject matter jurisdiction. *See United States v. Dalm*, 494 U.S. 596, 608, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990); *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). Given the parties' conflicting assertions as to the extent of the Court's subject matter jurisdiction, waivers of sovereign immunity, and whether Carrington may recover damages, the Court feels it is necessary to examine not only the extent to which the United States has consented to be sued, but also the Court's underlying basis for subject matter jurisdiction.

### A. Underlying Basis for Subject Matter Jurisdiction

■ 28 U.S.C. § 1334(b) provides that "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings under title 11, or arising in or related to cases under title 11." 28 U.S.C.A. § 1334(b) (West 2000), 28 U.S.C. § 157(b) further provides that "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district," and further that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 ..." 28 U.S.C.A. § 157(b)

(West 2000). The District Court for the Eastern District of Virginia has referred all of the types of proceedings listed in § 157 to this Court. *See In re Poplar Run,* 192 B.R. at 855.

But for § 1334(b), this Court would not have jurisdiction to hear this claim. In the parts of its Complaint seeking monetary relief for its claims,[6] Carrington asserts damages stem from HUD's wrongful conduct in relation to Carrington's operation of the Project; however, Carrington alleges in each instance that HUD's conduct constituted breach of the two regulatory agreements or the construction agreements into which Carrington and HUD entered. Since Carrington alleges that HUD's conduct constitutes breaches of the agreements in all instances, and since the damages Carrington alleges it sustained were incurred as a result of those alleged breaches, the Court construes all of Carrington's claims as breach of contract claims.

Breach of contract claims between the United States and a private entity are governed by the Tucker Act. *See* 28 U.S.C.A. § 1491 (West 2000). The Tucker Act provides in relevant part that, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* § 1491(a)(1). The Tucker Act grants the district court concurrent jurisdiction over breach of contract actions against the United States, but only for claims not exceeding $10,000. *See* 28 U.S.C.A. § 1346(a)(2) (West 2000). Given that this is a breach of express contract claim and the amount of damages for which Carrington prays is over $10,000, neither this

Court nor the district court would have jurisdiction over this case but for 11 U.S.C. § 1334(b)'s provision that waives exclusive jurisdiction in cases arising under, arising in, or related to cases under title 11.

In this instance, § 1334(b) waives the Court of Federal Claims' exclusive jurisdiction for breach of contract claims over $10,000; further, jurisdiction over this claim was initially proper under § 1334(b)'s "related to" jurisdiction because of the effect that Carrington's recovery of this claim would have on the estate. *See Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (noting with approval test articulated by Fifth Circuit Court of Appeals that existence of "related to" jurisdiction is based on whether outcome of proceeding could conceivably have effect on bankruptcy estate); *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.),* 86 F.3d 364, 372 (4th Cir.1996) (adopting same test).

■■ While jurisdiction is proper under § 1334(b), this proceeding must be a core proceeding arising under or arising in a case under title 11 in order for this Court to be able to enter dispositive orders in the adversary proceeding; otherwise, this Court may make only proposed findings of fact and conclusions of law to the district court, absent the parties' consent. *See* 28 U.S.C.A. §§ 157(b)(1), (c)(1). Normally, a breach of contract claim that the debtor brings for an alleged pre-petition contract breach must be treated as a noncore matter, even if the claim is based on a contract governed by federal law. *See Humboldt Express, Inc. v. The Wise Co. (In re Apex Express),* 190 F.3d 624, 630–633 (4th Cir.1999).

The Court believes that this proceeding has been converted into a core proceeding, however, by virtue of HUD filing a proof of claim. 28 U.S.C. § 157(b)(2)(C) pro-

---

**6.** The Court examines Carrington's request for declaratory relief separately in Section III, *supra.*

vides that "counterclaims by the estate against persons filing claims against the estate" are core proceedings. On June 8, 1998, the HUD Secretary filed a proof of claim against the estate for $1,130,777.10. The basis for HUD's claim was Carrington's mortgage defaults on the 236 and 241 Loans, including interest and other charges. While HUD's proof of claim was filed subsequent to Carrington filing its Complaint, HUD, by filing its proof of claim, waived its right to limit or bar the bankruptcy court from hearing counterclaims to HUD's claim based on the default of either the 236 or 241 Loan. By filing its proof of claim, HUD in essence converted Carrington's adversary proceeding from a breach of contract suit "related to" its bankruptcy to a proceeding to adjudicate a counter claim "arising under" title 11 as part of the Court's claim adjudication capacity. As a result, this Court has subject matter jurisdiction pursuant to § 1334(b) and § 1491(a)(1) and may dispositively adjudicate Carrington's claim as a core proceeding pursuant to § 157(b)(2)(C).

Notwithstanding its concession that this Court has subject matter jurisdiction (albeit on different grounds than the Court has cited *supra*), the United States asserts that this Court's jurisdiction is limited pursuant to the APA and that the Court cannot impose a judgment for monetary relief. Further, the United States contends that, because this is an APA case, the Court may only consider the "Administrative Record" to determine whether HUD's actions were appropriate, and must employ an arbitrary and capricious in such a determination. (United States' Mot. for Summ.J. at 59–60.) The Court does not believe, however, that the APA applies in this case.

B. Administrative Procedures Act

 The APA provides for judicial review of all administrative actions unless a statute prohibits review or "where agency action is committed to agency discretion by law." 5 U.S.C.A. § 701 (West 2000). The United States fails to point out, however, that judicial review of agency action may be conducted under the APA only for action for which "there is no other adequate remedy in a court." 5 U.S.C.A. § 704 (West 2000).

In *County of Suffolk v. United States,* 19 Cl.Ct. 295 (1990), the United States Claims Court (the predecessor to the United States Court of Federal Claims) addressed the relation between the remedies for which the Tucker Act and the APA provide. In that case, the plaintiff brought a breach of contract action against the Environmental Protection Agency (EPA) after the EPA refused to reimburse costs incurred in the design and construction of a public waste water facility. The plaintiff claimed that two grant agreements which it had entered into with the EPA, along with controlling EPA regulations, did not allow the EPA to refuse to reimburse the costs. *See id.* at 296.

The plaintiff in *County of Suffolk* asserted that the grant agreements constituted contracts with the EPA, that its complaint alleged a breach of those contracts, that no provision of the contracts limited the scope of the contract's review for breach of contract, and, as a result, the plaintiff was entitled to de novo review of its breach claim. *See id.* The EPA maintained that the grant agreements did not constitute "normal" contracts and that the appropriate standard of review was articulated in the APA. Consequently, EPA argued that review should be limited to the administrative record and that the EPA's decision should be overturned only if was found to be arbitrary, capricious, or not supported by substantial evidence. *See id.* The EPA therefore moved the court to prohibit discovery beyond the scope necessary to determine the completeness of the administrative record.

The court found that, as the EPA ultimately conceded, the grant agreements constituted complete contractual obligations because they involved "an unambiguous offer, an unambiguous acceptance,

and consideration passing between the parties." *Id.* at 296. The court noted that it typically considers whether a party has fulfilled its obligations under a contract on a de novo basis. *See id.* at 299. The court did note, however, that the scope of review of a breach claim could be limited by including appropriate limiting provisions in the contract or by regulation. Finding that no such contract provision or regulation existed, the court stated that "since the plaintiff can attack the EPA's decision in this court in a breach of contract action under the Tucker Act ... there is an 'adequate remedy at law' and, pursuant to its terms, the APA would not apply." *Id.*

While Carrington's Complaint makes allegations as to HUD's conduct, in each instance the conduct is alleged to constitute a breach of the regulatory agreements or construction contracts. As a result, the Tucker Act provides for an adequate remedy of law in all instances. Since, as the United States points out, the APA does not provide for monetary relief, *see* 5 U.S.C.A. § 702 (West 2000), the only adequate remedy Carrington would have on its breach of contract claims must necessarily be derived from the Tucker Act. The Court must therefore proceed on the assumption that this case is governed by the Tucker Act and, consequently, the limitations on remedies imposed by the APA, as well as the rest of the APA's provisions, do not apply in accordance with 5 U.S.C. § 704.

Since the APA does not apply in this case, however, the Court will not conduct a generalized inquiry into HUD's conduct vis-a-vis the Project. The Court will limit its review to whether a genuine dispute as to a material fact exists that HUD's alleged conduct in some way breached either the regulatory or construction agreements in a manner that is actionable under the Tucker Act.

### C. Sovereign Immunity

■ A party may not bring suit against the federal government or its agencies unless the United States has expressly consented to be sued. *See Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). The United States is deemed to have consented to suit only when it has expressly waived its sovereign immunity. Such waivers must be "unequivocally expressed" in statutory text. *See id.; Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *United States v. Nordic Village*, 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (citing cases). Waivers found in statutes are to be strictly construed in terms of their scope in favor of the sovereign. *See Department of the Army*, 525 U.S. at 260, 119 S.Ct. 687; *Lane*, 518 U.S. at 192, 116 S.Ct. 2092.

■ Nothing within 28 U.S.C. § 1334, § 1491, or § 157 contains the necessary "unequivocally expressed" waiver of sovereign immunity in their statutory text to empower the bankruptcy court to hear this case. Neither does anything in the legislative history of these sections indicate a congressional intent for such a waiver; in fact, the opposite is true as Congress specifically laid out provisions for sovereign immunity waivers under the Bankruptcy Code in 11 U.S.C. § 106. As a result, in order for this Court to hear this case, a valid waiver must exist in a statute apart from 28 U.S.C. § 1334, § 1491, or § 157.[7]

---

7. The Court's holding on this point is at odds with the Federal Circuit Court of Appeal's holding in *Quality Tooling, Inc. v. United States*, 47 F.3d 1569 (Fed.Cir.1995). In that case, a government contractor that had filed for relief under Chapter 11 of the Bankruptcy Code brought an adversary proceeding to recover on a breach of contract claim against the federal government, which normally only the Court of Federal Claims could hear, in the District Court for the Northern District of Alabama. The United States moved to transfer the cause to the Court of Federal Claims. The district court denied the motion and the United States appealed the denial to the Court of Appeals for the Federal Circuit. *See id.* at

### 1. 11 U.S.C. § 106

 Section 106 contains the Bankruptcy Code's only explicit waivers of sovereign immunity:

A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

11 U.S.C.A. § 106(b) (West 2000). Section 106(c) also provides that:

Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

*Id.* § 106(c).

HUD filed a proof of claim in this matter on June 8, 1998. In its proof of claim, HUD asserted that the basis of the claim was a mortgage default and that the claim was secured by real estate with a value of $542,582. The supporting documents attached to the proof of claim make clear that the real estate which allegedly secures the property is the Project.

By the terms of § 106(b), if Carrington's claim for damages arose out of the same transaction or occurrence out of which the United States' claim arose, the United States has waived sovereign immunity with respect to Carrington's claim. Likewise, regardless of whether Carrington's claim arose out of the same transaction, pursuant to the terms of § 106(c), the United States' claim shall be offset against Carrington's claim provided it is property of the estate. In the legislative history to 11 U.S.C. § 106, Congress explained that the purpose of § 106(c) (then § 106(b)) was to allow "the estate [to] offset against the allowed claim of a governmental unit, up to the amount of the governmental unit's claim, *any* claim that the debtor, and thus the estate, has against the governmental unit, without regard to whether the estate's claim arose out of the same transaction or occurrence as the government's claim." H.R.Rep. No. 95–595, at 317

1571–72. The court of appeals vacated and remanded the district court's denial.

On appeal, the United States asserted that the Tucker Act's waiver of sovereign immunity was co-terminus with the statute's jurisdictional provisions and, as a result, the United States did not waive its sovereign immunity as to suits brought in the bankruptcy court if the provisions of § 106 did not apply. *See id.* at 1573–74. The court disagreed with the United States' contentions and held that the Tucker Act waives sovereign immunity over all claims founded upon United States contracts in all courts with jurisdiction to hear such claims. The court reasoned that, "[i]f a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit" and, as a result, the Tucker Act by its terms waives sovereign immunity in any court to which Congress grants jurisdiction to hear the claim. *See id.* at 1574.

The court issued its ruling over a dissent by Judge Schall. The dissent pointed out that the United States had not filed a proof of claim in the bankruptcy proceeding, nor did the plaintiff have a substantive right enforceable against the United States arising under the Bankruptcy Code. Reiterating the Supreme Court's requirement that "a [sovereign immunity] waiver must be 'unequivocally expressed' in the statute, and that, in the Bankruptcy Code, the only such unequivocal language is found in § 106," the dissent contended that the sovereign immunity waiver found in the Tucker Act only waived immunity in the Court of Federal Claims. *Id.* at 1581 (Schall, J., dissenting). Thus, the dissent concluded that an additional waiver should be necessary for a court other than the Court of Federal Claims to hear the claim, even if the other court would otherwise have jurisdiction over those claims.

Based on the Supreme Court's reiteration in *Department of the Army*, a case decided after *Quality Tooling*, that waivers of sovereign immunity must be explicit within statutes and narrowly construed, the Court respectfully must disagree with the majority's view in *Quality Tooling* that the Tucker Act's sovereign immunity waiver extends beyond waiving immunity as to the Federal Court of Claims. Based on the Supreme Court's pronouncements on sovereign immunity, the Court finds the reasoning in the *Quality Tooling* dissent as more persuasive.

(1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6274; S.Rep. No. 95–989, at 29–30 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5815-5816.

Since the basis for the United States' claim is the Debtor's alleged default on the 236 and 241 Loans, Carrington's breach claims arise from the same transaction because Carrington's claims are based on the premise that HUD's default declaration and refusals to grant Carrington's various requests precipitated that breach. As a result, since Carrington's suit is property of the estate, the United States is deemed to have waived sovereign immunity pursuant to § 106(b). The Court therefore finds that the United States has waived its sovereign immunity as to Carrington's claims, to the extent that the statute of limitations does not bar the claims, and that the Court may impose monetary damages up to and including the amount of the United States' Proof of Claim, $1,130,777,10.

2. 42 U.S.C. § 1404a

 The Plaintiff asserts that the United States waived sovereign immunity under the "sue and be sued" clause of the United States Housing Act of 1936. *See* 42 U.S.C.A. § 1404a (West 2000).[8] The Fourth Circuit Court of Appeals has made clear that a sovereign immunity waiver may be implied from 42 U.S.C. § 1404a. *See Portsmouth Redevelopment & Housing Auth. v. Pierce*, 706 F.2d 471, 475 (4th Cir.1983). *See also Foxglenn Investors Ltd. Partnership v. Housing Auth.*, 844 F.Supp. 1078, 1084 (D.Md.1993), *aff'd sub nom. Foxglenn Investors Ltd. Partnership v. Cisneros*, 35 F.3d 947 (4th Cir. 1994). The provisions only waive sover-

eign immunity, however, where a damage award would be payable out of funds within HUD's exclusive control apart from treasury funds and treasury control. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985) (quoting *Federal Housing Admin. v. Burr*, 309 U.S. 242, 250, 60 S.Ct. 488, 84 L.Ed. 724 (1940)). If the recovery sought would come from the United States general treasury, sovereign immunity would remain a bar to the claim. *See Burr*, 309 U.S. at 250, 60 S.Ct. 488.[9]

Since any judgment that the Court would impose on HUD, over and above the amount that the judgment would offset HUD's proof of claim, would necessarily come out of the general treasury funds, *see Portsmouth Redevelopment*, 706 F.2d 471, 473–74 (finding that fund appropriated to HUD for payment of operating subsidies originates in public treasury and does not cease to be public funds after HUD appropriates them), 28 U.S.C. § 1404a does not provide any waiver of sovereign immunity that 11 U.S.C. § 106 does not otherwise provide. HUD, by virtue of filing its proof of claim, has therefore waived its sovereign immunity as to the imposition of money damages only up to the amount of its claim, and only to the extent that Carrington's claims are not time barred.

D. The Statute of Limitations

The United States asserts that the statute of limitations bars several of Carrington's claims. Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first

---

8. The statute provides, in relevant part, that: The Secretary of Housing and Urban Development may sue and be sued only with respect to its functions under the United States Housing Act of 1937, as amended . . . and title II of Public Law 671 . . . . Funds made available for carrying out the functions, powers, and duties of the Secretary of Housing and Urban Development . . . shall be available, in such amounts as may from

year to year be authorized, for the administrative expenses of the Secretary of Housing and Urban Development.
42 U.S.C.A. § 1404a.

9. The Fourth Circuit Court of Appeals has indicated it would follow this approach in *Reynolds Assoc. v. Kemp*, 974 F.2d 1331 (4th Cir.1992) (unpublished table decision).

accrues. *See* 28 U.S.C.A. § 2401(a) (West 2000).[10]

The United States maintains that Carrington's claim against the United States for failure to continue to insure the 241 Loan is barred by the statute of limitations. The United States asserts that, after the 241 Loan was assigned to HUD on November 8, 1991, no funds were available under the loan from that time forward. The United States claims that Carrington knew that HUD would no longer disburse any funds under the 241 Loan upon receipt of the April 6, 1992 letter, which stated that no additional mortgage funds would be available. The United States maintains that, based on those facts, Carrington's right of action on the failure to insure the 241 Loan advances accrued no later than April of 1992. Carrington's complaint was filed on May 6, 1998, more than six years after HUD issued the letter.

The United States also contends that several of Carrington's claims on the denial of requests for rent increases, replacement reserve releases, and additional LMSA units are also barred by the six year statute of limitations. The United States claims that Zuckerman's letter to Congressman Owen Pickett shows that HUD's refusal to implement the rent increase occurred in 1990 or 1991, beyond the six year period for the statute of limitations, and that the Debtor's claim for denial of its LMSA Applications dated July 12, 1991 and February 21, 1992, are also barred.

Carrington responds that the United States' issuance of the April 1992 letter is not the proper accrual date as to Carrington's claims on the United States' alleged wrongful denial of insuring section 241 loan funds because "continuing efforts were made between HUD employees and the Plaintiff for several years, after the issuance of the reference letter of notice, for the purposes of arriving at a workout for the 241 loan." (Pl's Mem. in Opp'n to Mot. for Summ.J. at 20.) Carrington asserts that correspondence exists in the administrative record that demonstrates these "continuing efforts," but does not specifically point to which correspondence is pertinent. *Id.* Carrington maintains that, during this period of negotiation, the 241 Loan was held in abeyance, and that the United States would have paid out the balance of the 241 Loan funding if a workout had been achieved. Carrington therefore contends that there are material facts in dispute as to the time when the United States no longer considered the loan viable.

Carrington also maintains that the claims surrounding the United States' insurance of the 241 Loan are not time barred because Carrington's Complaint does not directly seek relief that requires HUD to relinquish 241 funds. Carrington instead reads its Complaint as saying that HUD wrongfully used the alleged default of the 241 Loan as a continuing basis to deny Carrington's requests for rent increases, requests for payments from repair and replacement reserve accounts, and for HUD's failure to recommend and grant LMSA requests. Carrington also maintains that one of the audit findings surrounds Carrington's inability to account for monies that Carrington alleges were wrongfully denied from the 241 funding and that material facts remain in dispute as to whether the United States' action in interrupting the 241 Loan proceeds on that basis were arbitrary, capricious, outside the scope of HUD's authority, or constituted an abuse of discretion. Carrington maintains that, even if HUD's actions were taken prior to the six year statute of limitations, they are not time barred if HUD used those actions as a basis to subsequently withhold 236 Loan funds.

 The issue of whether any and all of Carrington's claims are time barred is

---

**10.** 28 U.S.C. § 2501, which imposes the same six year bar for claims over which the Court of Federal Claims has jurisdiction, also applies because the Court of Federal Claims would have concurrent jurisdiction with the bankruptcy court to hear this claim.

an additional issue pertaining to the United States' sovereign immunity. The United States' waiver of any sovereign immunity it possesses is limited by 28 U.S.C. § 2401(a) and § 2501, and, like other types of immunity waivers, such waiver must be strictly construed. *See United States v. Mottaz*, 476 U.S. 834, 841, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986); *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Spannaus v. United States Dep't of Justice*, 824 F.2d 52, 55 (D.C.Cir.1987). The condition of limiting the United States' waiver as to civil actions to six years from the date of accrual is jurisdictional in nature and creates a jurisdictional prerequisite to the suit. *See Spannaus*, 824 F.2d at 55; *Edwards v. United States*, 163 F.2d 268, 269 (9th Cir. 1947); *Huntington Steel Corp. v. United States*, 153 F.Supp. 920, 921 (S.D.N.Y. 1957).

▮ A right of action first accrues when all the events have occurred that fix the liability of the United States and entitle the claimant to institute an action in court and the complainant possesses sufficient facts about the harm done that a reasonable inquiry will reveal the cause of action. *See Jersey Heights Neighborhood Assoc. v. Glendening*, 174 F.3d 180, 186 (4th Cir.1999); *Spannaus*, 824 F.2d at 55; *Brown Park Estates–Fairfield Devel. Co. v. United States*, 127 F.3d 1449, 1454 (Fed. Cir.1997). While the date that the right of action first accrued is generally a factual matter and not appropriate for disposition on summary judgment, summary judgment may be granted if no genuine issue of material facts exists as to the accrual date. The Court will examine whether any genuine issue of material fact exists on the claims that the United States asserts are time barred.

1. Insuring the 241 Loan

▮ On April 8, 1992, HUD wrote a letter to Zuckerman in regards to a letter that Zuckerman wrote inquiring about payment of a roofing contractor from 241 loan funds. HUD's letter states, "[s]ince the ownership allowed the loan to go into default and it has been assigned to HUD, there are no additional mortgage funds available. Responsibility for any unpaid subcontractors rests with the project ownership and is not a responsibility of the Department ... We are again requesting that you have an audit performed to provide an accounting of the funds expended. As in the above case, the cost for performing the audit will be a responsibility of the project ownership ..." (United States' Exhibit # 410.) Carrington admits that, through the Project's general partner, it was on notice of HUD's decision to freeze 241 funds after April of 1990 and that, from the time that HUD was assigned the 241 Loan, no further 241 Loan funds were available; however, Carrington contends that, over a period of time subsequent to the letter, correspondence within the administrative record shows attempts by both parties to restore funding and "from the Plaintiff's perspective, life was left in the 241 loan, to the extent that if other alleged regulatory violations were cleared, the balance of the funding to complete repairs may have been forthcoming, as part of the workout." (Pl's Mem. in Opp'n to Mot. for Summ.J. at 20.)

Given the language of the letter that states that no additional mortgage funds would be available, Carrington could have used that letter as a foundation for a breach of the 241 Regulatory Agreement in a court proceeding based on HUD's failure to insure or advance funds to the debtor. HUD's position can be reasonably ascertained from the letter that it was not going to insure funds as a guarantor of the 241 Loan or advance funds as the assigned owner of the note under the conditions as they stood at the time of the issuance of the letter.

Zuckerman admits that he had knowledge of HUD's decision to freeze the 241 Loan in April, 1990, "funds from the 241 loan had been frozen, with all work stopped, since April of 1990." (Decl. of

Zuckerman ¶ 16.) *See also id.* ¶ 18 ("The freezing of the 241 funds on or about March 29, 1990 prevented the repayment [of project funds to contractors working on the job].... As a result ... project was not able to make its April 1st mortgage payment on the underlying 236 mortgage loan."). Thus, if HUD wrongfully denied to guarantee or advance funds, HUD's liability was affixed upon issuance of the letter because the date of the letter's receipt represents the latest possible date that Carrington had notice of HUD's position on the 241 Loan.[11]

Carrington asserts that there is a genuine issue of material fact as to the accrual date because of its ongoing attempts at reinstating the 241 Loan subsequent to the issuance of the letter. While Carrington does not point, in either its statement of material facts, its brief in support of summary judgment, or in Zuckerman's declaration, to explicit items in the record which would show that a genuine issue of material fact exists, it appears that even the language in the April 8, 1992 letter requesting that Carrington obtain an audit letter supports a contention that negotiations would have been possible that may have caused HUD to advance funds on the 241 Loan.

The fact that those negotiations might have existed misses the critical issue, however, of when the United States' potential liability affixed for failure to insure or advance 241 Loan proceeds. The United States would not have been able to avoid liability for failing to insure or advance 241 Loan proceeds unless it had actually restored the funds or accomplished a workout or other type of settlement with Carrington. Ongoing negotiations with Carrington would not have otherwise abated the United States' liability. Nothing in the record indicates that funds were ever restored or that a settlement or workout was achieved. Given that the uncontroverted material facts are that HUD never subsequently permitted 241 Loan proceeds to be advanced after assignment, that Carrington was on notice of the withholding of funds after the issuance of the April 8, 1992 letter, and that the United States subsequently never advanced those funds, Carrington's right of action as to HUD's failure to insure or advance funds first accrued when it received notice of HUD's decision in April of 1992, more than six years prior to the time Carrington filed its Complaint.

Carrington claims that its Complaint does not directly seek any relief in the form of requiring HUD to relinquish 241 funds and instead alleges that HUD has been using the default of the 241 Loan as a continuing basis for denial of rental increases, denial of requests for payments from repair and reserve accounts, and the granting of LMSA approval. While Carrington does not ask for any 241 funds to be relinquished, Carrington asserts, in the part of its Complaint in which it delineates its damages, that "as a direct and proximate result of the continuing breach of the Regulatory Agreements and construction agreement," that it has suffered $459,000.00 and $445,5000.00 respectively for loss of rental income and increase in the vacancy rate. (Complaint ¶¶ 25–26). Carrington fails to specify exactly to which breaches of the regulatory agreements and construction agreement it is referring.

In another part of the Complaint, Carrington claims that HUD wrongfully refused to make approved proceeds of the 241 Loan, (Complaint ¶ 12), that HUD's alleged actions constituted a breach of the 241 Regulatory Agreement (Complaint ¶ 13), and that such breach resulted in the

---

11. Given Zuckerman's statement that the freezing of funds caused the April 1st default on the 236 Loan, it is probable that Carrington had knowledge that funds were frozen on or about March 29, 1990; while the record may be unclear as to the exact date that Carrington had knowledge, it appears clear from the record before the Court that no genuine issue of material fact exists that Carrington had notice of HUD's intent in April of 1990.

Plaintiff from being able to make required repairs and capital improvements. (Complaint ¶ 14). Carrington asserts that, as a result of its inability to complete required repairs due to the withholding of 241 funds, HUD refused to grant rental increases that had Carrington had anticipated. (Complaint ¶ 15). Without the Complaint being more specific, the Court must assume that the Plaintiff is using the fact that HUD refused to advance 241 Loan funds and the alleged breach of the 241 Regulatory Agreement such refusal created as at least a partial basis for the damages it seeks. Thus, to the extent that it would be possible to identify what part of the damages were attributable to HUD's alleged breach of the 241 Regulatory Agreement by HUD's failure to insure or advance 241 Loan funds, it is possible to set that breach apart, as outlined in paragraph thirteen of the Complaint, as a separate cause of action. Therefore, Carrington would not be able to seek damages that would be attributable to the alleged breach of the 241 Regulatory Agreement caused by the withholding of 241 Loan funds because that claim is time barred, unless the statute of limitations had not tolled because such a claim could be considered a continuing claim.

■ Contrary to what Carrington asserts, the portion of its claim attributable to breach of the 241 Regulatory Agreement resulting from HUD's withholding 241 funds is not a continuing claim. The Court of Appeals for the Federal Circuit articulated when a claim can be considered a continuing claim for § 2501 purposes in *Brown Park*. In that case, the owners of various apartment rental properties in Louisiana who had entered into HAP contracts sued HUD for allegedly failing to make proper rent adjustments in violation of their contracts. The specified times for which HUD allegedly failed to make proper rent adjustments were from 1986 to 1988, except for one instance where HUD allegedly failed to make a rent adjustment in 1991. The complaint in that case was filed on October 28, 1994. In that case, the United States moved to dismiss the complaint on the ground that the Plaintiffs' claims were time barred. The defendants asserted that theirs claims were covered under the "continuing claims doctrine" and were therefore not barred by the statute of limitations. The Court of Federal Claims granted the motion to dismiss for all but the 1991 claim; the court concluded that the plaintiffs' claims were all time barred except the 1991 claim and that the continuing claim doctrine did not apply. *See Brown Park*, 127 F.3d at 1453–54.

The plaintiffs appealed and the Court of Appeals for the Federal Circuit affirmed the decision. On appeal, the plaintiff-appellants argued that HUD's failure to make rental increases between 1986 and 1988 resulted in damages to appellants not only during the years the alleged breaches occurred, but also that each denial reduced the basis on which subsequent rent adjustments were calculated. As a result, the plaintiff argued that the denial inflicted damages in subsequent years, including the years in which their claims would not be time barred. Thus, the appellants argued that the continuing claim doctrine applied. *See id.* at 1455.

The court reasoned that the appellants' claims for breach accrued when HUD allegedly failed to make the proper rent adjustment and, at the time the refusal occurred, "the government's liability was fixed and appellants were entitled to institute an action." *Id.* As a result, the court held that the claims falling outside the six-year period were barred by the statute of limitations unless the continuing claim doctrine applied.

The court further reasoned that the continuing claim doctrine did not apply because the claims were each based on a single distinct event, the denial of a rental increase, and that the mere fact that these decisions may have resulted in "continued ill effects later on," did not make them continuing claims. *See id.* at 1456. The court wrote that, "in order for the continu-

ing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Id.* The court cited examples of periodic pay claims, i.e. suits for additional pay at higher grades, claims for greater statutory or regulatory compensation, or claims seeking special statutory allowances, as examples of claims in which the continuing claim doctrine applies. *See id.* at 1456–57. In those cases, the court reasoned that the statute of limitations does not toll because "compensation was due and payable periodically, a claim arose each time the government allegedly failed to pay the proper amount." *Id.* at 1457.

The court distinguished the periodic pay claims cases from the alleged HAP contract breaches on the basis that each failure to pay properly a periodic claim constituted a particular wrong, i.e., a statutory or regulatory violation, independent of the original wrong, whereas the decisions to withhold rent increases constituted singular wrongs that were independently accruing violations. The court reasoned that, although consequential damages from the alleged violations may have arisen within the statutory period, the damages were merely the result of and dependant on singular alleged violations that arose outside the six-year period and were therefore time barred. *See id.* at 1458.

Like the alleged violations in *Brown Park*, HUD's decision to no longer advance funds under the 241 Loan was a singular alleged violation that began and ended with HUD's decision to no longer advance funds. Any claim of damages that arose from the refusal to continue to advance funds is necessarily a claim dependant on HUD's original refusal to advance funds

and does not constitute a continuing claim. Therefore, Carrington's claim that the refusal to advance 241 Loan funds was a breach of the 241 Regulatory Agreement or construction contracts, resulted in preventing the Plaintiff from completing required repairs, and/or resulted in HUD refusing to grant rental increases and the resulting consequential damages for that refusal are barred by the statute of limitations.

2. Rental Increases and Payments from Repair and Reserve Accounts

■ The United States also asserts, without specifying, that several of the Debtor's other claims regarding HUD's denial of rent increases, replacement reserve releases, and the agency's failure to grant additional LMSA units are also time barred.[12] It does not appear, however, based on the Complaint's allegations, that Carrington's other claims are time barred. Besides the claims surrounding the advance of the 241 Loan, Carrington's Complaint maintains that HUD breached the 236 Regulatory Agreement on the basis of the Audit Report HUD issued on October 26, 1995 and the four disputed audit items contained therein. The Debtor alleges that HUD declared a default as a result of the violations of the regulatory agreement; additionally, Carrington claims that HUD's declaration of default was erroneous and itself constituted a breach of the regulatory agreement. Carrington further alleges that, as a result of the declaration of default, HUD had refused to permit the Plaintiff to obtain periodic rent increases and to obtain payments from its repair and replacement reserve account. Carrington claims these refusals also constitute breaches of the 236 Regulatory Agreement that, in turn, have deprived the Plaintiff of

---

**12.** Carrington does not contend, in its Complaint, that denial of LMSA requests constitute a separate breach of the regulatory agreement. Instead, Carrington maintains that it has been denied the "financial benefits" of the program "as a direct and proximate result" of the other breaches of the regulatory

agreement. The Court will not consider evidence of denials of LMSA unit requests as a separate basis for breach of either the 236 or 241 Regulatory Agreement. Consequently, the Court will not reach the issue of whether Carrington's denial of LMSA units is time barred.

the funds needed to maintain the physical property and attract tenants.

Based on the structure of Carrington's Complaint, all of the claims and damages arising from those claims that do not originate with HUD's failure to advance 241 Loan funds necessarily must originate from HUD's declaration of default based on the findings of the October 26, 1995 Audit Report.[13] It is uncontested that that declaration of default occurred after the issuance of the Audit Report, thus Carrington's claims based on the declaration of default occurred within the statutory period and are not time barred; however, because Carrington alleges that HUD has refused to permit the Plaintiff to obtain periodic increases and refused to permit Plaintiff to obtain payments from its repair and replacement reserve accounts based on HUD's declaration of default, only HUD's refusals to permit rent increase and advances subsequent to the declaration of that default can be considered to be derivative of HUD's default declaration. Thus, only refusals to permit rent increases and advances after October 26, 1995 would be considered to be breaches of the 236 Regulatory Agreement caused by HUD's default declaration and, as a result, may be the only refusals considered to be a part of Carrington's claim in regard to rental increases and requests to obtain funds from replacement reserve accounts.

13. While the undisputed facts establish that the audit findings that make up the basis for Carrington's claim were originally derived from the June 22, 1992 audit, Carrington does not allege a breach of agreement on the basis of the original audit; instead, Carrington has alleged that the uncleared audit findings contained in the Oct. 26, 1995 Audit Report were the basis for HUD declaring a default of the 236 Regulatory Agreement. Carrington's allegations as to the refusal to permit rent increases and the use of replacement reserve accounts, and the resulting breaches of the regulatory agreements based on those denials, are attributed in the Complaint to other defaults or breaches of the regulatory agreements. (Complaint ¶¶ 23, 27.) The only other regulatory agreements which Carrington

## II. Summary Judgment on Plaintiff's Remaining Claims

In considering a motion for summary judgment, the Court must interpret the facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 580, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir.1995). However, in order to survive a motion for summary judgment, the non-moving party must demonstrate that the factual dispute is material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Culver v. Continental Ins. Co.*, —— F.3d ——, ——, No. 98–1772, 1999 WL 503527 at *3 (4th Cir. July 16, 1999). In order for the United States to prevail on summary judgment against Carrington's claims, the United States must show that, provided that Carrington can demonstrate that a genuine dispute of material fact exists regarding HUD's particular conduct in administering the Project, Carrington, as a matter of law, is not entitled to recover because the conduct alleged does not constitute a breach of the 236 Regulatory Agreement. The Court will therefore proceed to examine whether the United States can demonstrate it is entitled to judgment on the claims not barred by the statute of limitations.

alleges are the breaches allegedly attributable to HUD's refusal to advance 241 Loan funds (Complaint ¶ 13), and the breach HUD allegedly caused by declaring the default based on the uncleared audit findings contained in the October 26, 1995 Audit Report (Complaint ¶ 22). Given the Court has held that claims stemming from the alleged breach of the 241 Regulatory Agreement are time barred, the only actionable breach claims Carrington has stem from the alleged breach outlined in paragraph twenty-two, which must result necessarily from the default declaration made after the issuance of the October 26, 1995 Audit Report. Only additional denials or refusals after that date can be considered actionable based on the structure of Carrington's Complaint.

## A. Declaring the Default

Carrington alleges that HUD breached the 236 Regulatory Agreement by declaring the loan secured by the Project to be in default based on the October 26, 1995 audit report. Paragraph eleven of the 236 Regulatory Agreement includes provisions relating to default and provides, in relevant part:

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner [of HUD] may give written notice, thereof, to Owners, by registered or certified mail.... If such violation is not corrected to the satisfaction of the Commissioner within thirty days after the date such notice is mailed or within such further time as the Commissioner reasonably determines is necessary to correct the violation, without further notice the Commissioner may declare a default under this Agreement effective on the date of such declaration of default and upon default may:

(a)(1) If the Commissioner holds the note-declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage....

(United States' Exhibit # 114.)

Provided that the regulatory agreement does not impose an obligation on HUD to perform the actions of which Carrington complains, then HUD's actions would not support a breach of the regulatory agreement. *See Reynolds Associates v. United States,* 31 Fed.Cl. 335, 339 (1994) (stating, in suit for breach of a 236 loan regulatory agreement, that "[a] party must rely on the express obligations of its agreement, rather than attempt to bring into the agreement requirements expressed not expressed therein.") (citing *Texas v. United States,* 210 Ct.Cl. 522, 537 F.2d 466 (1976)); *see also Beck Park Apartments v. United States Dep't of Housing and Urban Dev.,* 695 F.2d 366, 370 (9th Cir.1982) (holding HUD did not relinquish authority to decrease rents under 236 regulatory agree-

ment because no express provision applied to rent decreases). Consequently, the Court must confine the scope of its review to whether the regulatory agreement into which HUD and the Debtor entered constituted a contract and whether any of HUD's actions constituted a breach of the agreement as alleged by Carrington.

The United States contends that the provisions of the regulatory agreement involved in this case are not sufficient for the debtor to maintain a breach of contract action. The United States asserts that the provisions do not impose upon HUD the duties which Carrington claims they impose, or any contractual duties at all for that matter, and specifically denies that a declaration of default would constitute a breach of the regulatory agreement. Further, the United States contends that even if HUD had determined that a declaration of default was actionable, the declaration of default was properly supported and did not breach the regulatory agreement.

Carrington responds that, because HUD's actions do not rise to the level of actions designed to interpret a statute or regulation, but that HUD is instead attempting to "impose its unilateral contractual interpretations upon the Plaintiff, under the guise of exercising its interpretive regulatory agency authority." On that basis, Carrington contends that little or no deference should be given to HUD's interpretation of its duties under the, contract.

Carrington points to the Fourth Circuit Court of Appeals case of *Burgin v. Office of Personnel Management,* 120 F.3d 494 (4th Cir.1997) for support of its position. In *Burgin,* the plaintiff complained that the Office of Personnel Management had improperly denied the plaintiff's deceased wife medical benefits under a health insurance contract issued by OPM on behalf of federal employees. The decedent suffered a cardiac arrested, was hospitalized, and lapsed into a coma from which she did not recover. The decedent was subsequently transferred to a nursing center, where she

died. After her death, the decedent's husband subsequently filed a claim with the insurance company to pay for his wife's nursing care in reliance of language in the insurance contract that said "[t]he Plan provides a comprehensive range of benefits with no limit as to dollars or days when full-time skilled nursing care is necessary and confinement in a skilled nursing facility is medically appropriate as determined by a Plan doctor. You pay nothing. All necessary services are covered." *Id.* at 495. The insurance company denied coverage, however, based on a Plan exclusion for "custodial care, rest cures, domiciliary or convalescent care." *Id.*

Eventually, the insurance company's decision was appealed to OPM, which affirmed the denial. After exhausting his administrative remedies, the decedent's husband filed suit in federal court. The district court entered summary judgment, ruling that OPM's action in affirming the insurance company's denial of coverage was not "'arbitrary and capricious' and that there was no evidence that OPM's interpretation was 'plainly erroneous or inconsistent with the plain language of the Plan.'" *Id.* at 496 (no internal citation in original).

The Fourth Circuit Court of Appeals reversed. While the court of appeals found that the APA applied and that, as a result, the court must show substantial deference to an agency's interpretations of its own regulations, "[w]hen the administrative interpretation is not based on expertise in the particular field ... but is based on general common law principles, great deference is not required." *Id.* at 497 (quoting *Jicarilla Apache Tribe v. Federal Energy Regulatory Commission,* 578 F.2d 289, 292–93 (10th Cir.1978)). Based on that pronouncement, the court determined that, while it would defer to the agency's determination of whether a health benefits contract meets regulatory requirements, where the dispute is not to be resolved by reference to regulatory provisions governing the features of an acceptable contract, but rather is a question of the interpretation of the contract's language, that interpretation was a question of law to be reviewed de novo. *See id.* at 497–98.

The court still maintained, however, that with respect to factual matters to which the contract interpretation may be applied, the court would only review to determine whether the agency's determination was arbitrary or capricious, although such inquiry is still to be searching and careful. *See id.* at 498. The court then proceeded to interpret the Plan's language and concluded that, based on interpreting the contract as a whole, the plaintiff had been entitled to benefits and reversed to the district court with instructions to direct the payment of benefits to the plaintiff. *See id.* at 499.

In order to determine whether Carrington's alleged breach is actionable, the Court must first determine whether the 236 Regulatory Agreement is an enforceable contract. If the answer to that question is affirmative, the Court must then evaluate the standard to apply to HUD's actions in declaring the default under the regulatory agreement. Finally, the Court must determine whether a genuine issue of material fact exists that HUD's default declaration could breach that standard. If no genuine issue of material fact exists that gives rise to an inference that HUD's conduct violated the appropriate standard, then the United States is entitled to summary judgment on that claim.

### 1. Contractual Rights Under the 236 Regulatory Agreement

The first issue that the Court must resolve in the present case is whether the 236 Regulatory Agreement itself constituted an enforceable contract that HUD would have been capable of breaching. In general, a regulatory agreement entered into with a government unit may constitute a valid and enforceable contract provided that the requisite offer, accep-

tance, and consideration exist that create an enforceable obligation. *See County of Suffolk*, 19 Cl.Ct. at 297. In at least one instance, a court has found, in *dicta*, that HUD regulatory agreements give rise to contractual relationships. *See Cienega Gardens v. United States*, 194 F.3d 1231, 1245 (Fed.Cir.1998).

In *Cienega*, the Federal Circuit Court of Appeals noted that regulatory agreements that owners of low and moderate-income housing had entered into with HUD in exchange for HUD's endorsement for insurance did, in fact, create contractual relationships; however, that court determined that, in each instance, "the contract evidenced by each of the regulatory agreements was limited in scope to obligations on the part of the Owner that were in consideration for HUD having endorsed the deed of trust note which evidenced the loan to the Owner from its lending institution." *Id.* The court ultimately ruled that the plaintiffs could not bring a breach of contract claim because, even though the regulatory agreements constituted valid contracts with the property owners, no privity of contract existed on the issue for which the owners had alleged a breach. *See id.* at 1246.

▆▆▆▆ Ultimately, the plaintiff bears the burden of proving, by a preponderance of the evidence, that the 236 Regulatory Agreement constituted a valid contract. The existence of such a contract is generally a mixed question of fact and law; however, the question of whether the requisite offer, acceptance, and consideration exists to make a valid contract is generally a factual matter. Thus, for purposes of the summary judgment motion, it is sufficient that Carrington demonstrates that a genuine dispute of material fact exists as to those contractual elements.

▆▆▆▆ Looking at the language of the agreement, it appears that such a genuine dispute exists. The 236 Regulatory Agreement states that the project owners, "in consideration of the endorsement for insurance" and "in order to comply with requirements of section 236 of the National Housing Act" shall agree to comply with the provisions of the regulatory agreement. (United States' Exhibit # 114.) Absent any material evidence on the United States' part that the contract's language was not intended to create a contractual relationship, such language gives rise to a genuine issue of material fact such that, for the purposes of this summary judgment motion, the Court must assume that a contract exists.

2. Standard of Review

▆▆▆▆ Because Carrington maintains that it is not questioning HUD's ability or authority to draft and require the use of regulatory agreements, Carrington asserts that the *Burgin* analysis is applicable and that the Court must conduct an analysis of the regulatory agreements without deference to HUD's interpretation. While the analysis in *Burgin* is applicable in this case, applying *Burgin* to the facts here does not lead to the outcome the Debtor urges. *Burgin* makes clear that when an administrative agency's contractual interpretation is not based on expertise in the particular field, but is instead based on general common law principles, a court need not show deference to the agency's interpretation of its contractual obligations. *See Burgin*, 120 F.3d at 497. In order to determine whether deference must be extended, however, it is necessary to analyze whether the interpretation complained of is based upon the agency's expertise in a particular field.

▆▆▆▆ In its Complaint, Carrington asserts that HUD wrongfully declared a breach of the regulatory agreement based on the four outstanding Audit Report findings. As a question of contractual interpretation, Carrington is asking the Court to find that HUD erroneously found that Carrington was in default of the 236 Regulatory Agreement in contravention of paragraph eleven of that agreement. Unlike the examination in *Burgin*, the process of

investigating violations of the regulatory agreement and declaring defaults based on such violations are committed to HUD's authority by statute, *see, e.g.,* 12 U.S.C.A. § 1715z–1, § 1715z–6, and based upon HUD's expertise in administering housing projects. Thus, applying the analysis used in *Burgin,* the Court would be compelled to extend deference to the agency's discretion as to when it is appropriate to declare defaults of the regulatory agreement.

The Court recognizes, however, that the grounds for extending deference to the agency in *Burgin* was § 706 of the APA and that the APA does not apply on Carrington's monetary claims. Even though the APA does not apply in this case, HUD is still entitled to deference as to the contractual interpretation for declaring a regulatory agreement violation. No court in the Fourth Circuit has examined the degree of deference that must be extended to HUD's contractual interpretation of its regulatory agreements. Other decisions provide some insight, however, into the appropriate degree of deference that must be extended to HUD's declaration of a breach under the regulatory agreement.

The Ninth Circuit Court of Appeals articulated a standard in *Beck Park.* In that case, owners of federally-subsidized multi-family housing project in California who had entered into a 236 loan regulatory agreement sued HUD for breach of the agreement. The owners alleged that HUD, in determining that certain subsidized rents should be lowered in light of state-mandated property tax reductions, breached the regulatory agreement because the agreement and precluded HUD from initiating decreases in rents. The district court granted partial summary judgment in favor of HUD on the breach claims and directed judgment in the agency's favor. *See Beck Park,* 695 F.2d at 368.

The court of appeals upheld the district court's determination. In its opinion, the court noted, despite language in the regulatory agreement that addressed rent increases, that the regulatory agreement did not preclude HUD from initiating rent reductions because decreases were not specifically covered in the regulatory agreement. *See id.* at 369. The court stated that "[a] public body may not by contract grant to a private entity the authority to control legislative or government powers and functions that are delegated to it." *Id.* at 370 (citing 10 McQuillin, Municipal Corporations § 29.07 at 230–31 (3d ed.1981); 73 C.J.S. *Public Administrative Bodies and Procedure* §§ 57, 49 (1951 & 1982 Supp.)). The court also stated that the regulatory agreement was not a private contract and that "[w]here, as here, a public interest is involved 'an interpretation is preferred which favors the public.'" *Id.* (quoting Restatement of Contracts § 236(f)). The court determined, as a result, that consideration of the regulatory agreement must be made against the backdrop of the National Housing Act. *See id.* The court concluded that the district court's determination was proper because, otherwise, the HUD Secretary could not otherwise effectively discharge the congressionally mandated duty to maintain reasonable rents and to allow project owners a reasonable return on their investments; further, the court found nothing within the regulatory agreement indicated that HUD had renounced its power to reduce rents. *See id.* at 370.

Because HUD cannot contractually diminish its Congressionally-mandated duty to regulate low-income housing under § 236 of the National Housing Act, and because HUD's capacity to declare a default under the regulatory agreement is an extension of its regulatory functions, the same degree of deference committed to agency action in general must be extended to HUD in its ability to declare a default under the regulatory agreement. Therefore, the *Burgin* analysis is applicable even though this is not a case governed by the APA. Because HUD's contractual interpretation of when to declare a breach of the regulatory agreement for § 236 violations

is based on its expertise at administering housing projects, HUD's interpretation must be extended deference under *Burgin*.

Additionally, the language of paragraph eleven of the 236 Regulatory Agreement gives HUD broad discretion in relation to declaring a default. Upon finding that a breach has occurred, this paragraph gives HUD the power to declare a default if the breach is not cured to its satisfaction. Otherwise, HUD is empowered, under the regulatory agreement, to accelerate the balance of the loan and foreclose on the mortgage. Given the language of the regulatory agreement, combined with the necessity that the courts must give administrative agencies broad latitude in the way they accomplish their regulatory functions, HUD has broad discretion in determining whether a default of the regulatory agreement has occurred.

Therefore, provided that HUD has appropriately given adequate notice of violations and the contractually-mandated time to cure the violation before declaring a default, HUD's actions in declaring a default must be reviewed under an arbitrary and capricious standard. As there is no genuine issue of material fact evident from the record that Carrington was provided inadequate notice of the violations or that Carrington was not provided with the requisite thirty days to cure, the Court will employ an arbitrary and capricious standard to examine whether HUD erred in

declaring the 236 Regulatory Agreement in default.

### 3. HUD's Actions Under the 236 Regulatory Agreement

 On the first uncleared audit finding, Carrington claims that it had provided adequate documentation to clear the finding that it had improperly allocated $12,740 in payroll costs. HUD acknowledges that it received documentation to support $8,000 of the improperly allocated payroll, but that it never received documentation regarding the remainder and disagreed with HUD's local Richmond office to simply write it off. While Carrington contends that it provided sufficient documentation to clear the entire finding, Carrington fails to provide any proof of documentation as to the $4,740 discrepancy.[14] While Carrington claims that HUD's local office recommended clearing the audit finding, it appears undisputed from the record that it recommended writing off the discrepancy and did not recommend clearing it because it had not received adequate documentation as to the $4,720. It is also undisputed that Carrington never repaid the $4,720. As a result, the undisputed facts indicate that it was not arbitrary and capricious for HUD to declare a breach of the regulatory agreement based on that audit finding alone. Because HUD's action of declaring a breach was proper, HUD did not commit a

---

**14.** In his Declaration, Zuckerman asserts that the then project manager, Lawson Realty, documented the allocation and "was prepared to defend their documentation in Court, should the Owner elect to pursue collection." (Decl. of Zuckerman ¶ 37.) Zuckerman also contends that Carrington sued Lawson in an attempt to recover $4,700 of the incorrect payroll allocation, but that the suit was unsuccessful because HUD refused to provide a witness or discovery supporting the Owner's position. (Decl. of Zuckerman ¶ 38.). Zuckerman's contentions alone, however, do support a genuine issue of material fact. While Zuckerman contends that it was prepared to provide documentation, through Lawson, there is no citation to any document currently before the court that would lead the Court to

indicate such documentation actually exists. Further, HUD's refusal to testify or provide information in a suit between the owners and managers of the Project is not relevant to the inquiry as to whether sufficient documentation ever existed to support Carrington's claim. In fact, Zuckerman's statement that it attempted to sue to recover $4,700 of incorrect payroll allocation cuts the other way, as it acts as an admission that the $4,700 was improperly allocated in the first place by the Owner through its agent. Thus, while Carrington does dispute that the payroll was wrongfully allocated, the factual record currently before the Court fails to raise a genuine dispute of material fact that adequate documentation was ever provided.

breach of the regulatory agreement by declaring a default on the grounds of the first uncleared audit finding.

Likewise, in the second uncleared audit finding, Carrington does not dispute that it was in violation of the regulatory agreement for using project funds to fund capital improvements, but asserts that the money would have been returned to the fund had the 241 Loan not been erroneously suspended. Carrington does not contest, however, that taking the project funds and using them for capital improvement projects was a violation of the regulatory agreement. Carrington is time barred from asserting that denial of 241 Loan funds constituted a breach of any agreement. However, even if Carrington's assertion were actionable, the fact that Carrington intended on replacing the funds that it had wrongfully withdrawn would not, in and of itself, cure the default pursuant to the 236 Regulatory Agreement's terms. Thus, HUD did not act arbitrarily or capriciously in finding that the misappropriation of project funds constituted a violation of the regulatory agreement.

In regard to the fourth audit finding, Carrington again does not contest that it was in violation of the regulatory agreement for improperly withdrawing funds from the tenant security deposit trust. Instead, Carrington claims HUD had knowledge of this occurrence as early as 1985 and that the improper withdrawal was never used as a basis for denying rent increase, repair and replacement requests,

or preventing renewal of the HAP contract. However, Carrington fails to provide support in its citation to the factual record that amounts to a genuine issue of material fact that HUD was estopped from finding the withdrawal was a violation of the regulatory agreement.[15] Therefore, there is no genuine issue of material fact that supports a contention that HUD acted arbitrarily or capriciously by declaring a default on those grounds as well.

As to the third uncleared audit finding, in which HUD claimed that $141,261 in unsupported costs were paid from project funds, Carrington claims that it provided sufficient documentation for HUD to clear that audit finding as well. HUD maintains that, while Carrington adequately supported $13,289 of this audit finding, documentation was never provided to clear costs attributable to two of Carrington's management companies, PPM and Lawson Realty, for at total of $127,972. Carrington does not cite to the administrative record, but claims, based on Zuckerman's declaration, that in regards to the costs attributable to PPM, the finding on unsupported costs came from the information of the owner's auditor, that the auditor's findings were in error, which the auditor admitted, and that HUD's Richmond office recommended clearing the finding.[16] Likewise, Carrington claims that HUD's Richmond office recommended that the findings as to Lawson Realty be cleared based on documentation that it received and that the OIG refused to clear the

---

**15.** Carrington makes a factual assertion that, in 1995, the security deposit balance was fully restored and that the security deposit account was fully funded. (Decl. of Zuckerman ¶ 35.) In support of this assertion, Carrington cites to a letter Zuckerman wrote to Mr. Richard Warren of HUD on May 4, 1993 in which Zuckerman stated that the security deposit is fully funded. (United States' Exhibit # 520). Zuckerman's declaration is essentially a reassertion of his position stated in the letter. This statement, without additional support such as a balance statement or other type of financial record, is insufficient to create a genuine issue of material fact that the security deposit balance was ever brought current.

**16.** Unlike the first uncleared audit finding, it appears that HUD's local office recommended to clear this audit finding in full, as opposed to writing off the discrepancy as in the first audit finding. Thus, while Zuckerman's Declaration does not cite to anything in the record before the Court that would support a claim that accurate documentation was provided, the Court must infer from the findings of the HUD local office that some sort of documentation was provided that may support Carrington's factual claim on this audit finding where such evidence is non-existent on the first audit finding.

finding even with the documentation provided.

HUD does not cite to the record regarding its basis for finding the supporting documents insufficient. Thus, based on Zuckerman's declaration, there appears to be a genuine issue of material fact as to whether HUD may have acted arbitrarily or capriciously in declaring a breach on the third audit finding; however, because any one of the audit findings, in and of itself, would support a declaration of breach of the 236 Regulatory Agreement, the fact that there is no genuine issue of material fact that HUD did not abuse its discretion in finding a violation of the regulatory agreement in three out of the four uncleared audit report items support the contention that HUD did not violate paragraph eleven of the 236 Regulatory Agreement by declaring a default. Therefore, Carrington cannot maintain a claim for breach of the 236 Regulatory Agreement based on the issuance of the October, 1995 Audit Report.

### B. Denial of Rental Increases and Access to Replacement Reserve Accounts

Carrington's assertion that HUD's refusal to permit periodic rent increases and to obtain payments from its repair and replacement reserve accounts also constitutes a breach of the regulatory agreements is unfounded. Nothing within either regulatory agreement outlines a duty by HUD to grant requests for rent increases or to release account funds. The only duties surrounding these requests in the 236 Regulatory Agreement are imposed on the property owner. Since no duty arises under the regulatory agreements for HUD, Carrington cannot make a claim that the refusal to grant such requests constitutes a breach of the regulatory agreement.

### III. Failure to Provide Subsidy

Carrington asserts a prayer for declaratory relief as a separate part of its Complaint. In its prayer, Carrington asks that the Court declare that it is entitled to a credit for the 236 Loan interest subsidy and that Carrington may effect a payoff of the loan balance using this subsidy. According to Carrington's Memorandum in Opposition to Summary Judgment, Carrington is asking that the Court order HUD to pay, as an offset to the 236 Loan balance, the present value of the subsidy to which Carrington would have been entitled for future monthly payments on the 236 Loan provided that HUD had not assumed and accelerated the loan balance due.

Regardless of how the plaintiff characterizes its case, the court looks to the true nature of the action in order to determine whether proper jurisdiction exists. *See Katz v. Cisneros*, 16 F.3d 1204, 1206 (Fed.Cir.1994); *Maier v. Orr*, 754 F.2d 973, 982 (Fed.Cir.1985). Because this payoff, if granted, would necessarily need to be paid out of the treasury or would require HUD to forebear part of its recovery of the 236 Loan balance, the Court treats Carrington's demand for declaratory relief as an additional demand for monetary relief.

The APA specifically provides that it does not provide jurisdiction over claims for monetary damages. *See* 5 U.S.C.A. § 702 (West 2000). Consequently, like all of Carrington's other claims, there must be some basis for jurisdiction under the Tucker Act in order for the Debtor to be entitled to the credit. The United States denies Carrington is entitled to such a credit and asks this Court, in its memorandum in support of summary judgment, to declare that it may terminate the subsidy.

Nothing within the applicable loan documents or regulatory agreement provides a mechanism by which the debtor may receive a credit for its subsidy payments over and above what HUD must pay the Debtor on a monthly basis, i.e., no provision to "accelerate" the subsidy contractually exists. While HUD is statutorily empowered to make subsidy payments, the

statute does not mandate that such payments must be made. *See* 12 U.S.C.A. § 1715z–1(a). Furthermore, the determination of whether a subsidy shall be paid is committed to HUD's discretion by regulation and HUD may terminate the subsidy if a Project owner is shown to not be in compliance with a regulatory agreement. *See* 24 C.F.R. § 236.570(b)(3). Given that there is no contractual basis, no statutory basis for Carrington's claim, the regulation commits to HUD the discretion to terminate the subsidy upon violation of the regulatory agreement, and that no genuine issue exists that HUD was not in breach of the 236 Regulatory Agreement for declaring a default on the basis of Carrington's violations of that agreement, Carrington's request for declaratory relief does not state a claim on which relief may be granted.[17]

### Conclusion

The United States' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED

---

**17.** The Court declines to reach the issue of whether the United States is entitled to terminate the loan subsidy. The United States only makes this request in its brief in support of summary judgment and has not raised this as a separate claim for declaratory judgment or as a counterclaim to Carrington's request for declaratory judgment in an appropriate pleading. Thus, given the manner in which the United States makes its request, Carrington would not be in the position to adequately address the merits of the United States' request without the United States formally bringing a complaint or counter-claim against Carrington.